635 A.2d 8

**Daniel M. COURTNEY, et al.**

v.

**HARFORD COUNTY, Maryland.**

**No. 481, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Jan. 3, 1994.

Edward J. Lilly (Peter G. Angelos, on the brief), Baltimore, for appellants.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Joseph I. Cassily, State's Atty., for Harford County, Bel Air, on the brief), for appellee.

Argued before WILNER, C.J., ALPERT, J., and JAMES S. GETTY (Retired), (Specially Assigned), Judge.

WILNER, Chief Judge.

There are two issues in this appeal: (1) whether the Circuit Court for Harford County erred in declaring that a plea agreement between the State and appellants, Daniel and

Joanna Courtney, was null and void because of a breach of that agreement by the Courtneys, and (2) whether that ruling is presently appealable. We shall answer both questions in the affirmative.

Daniel Courtney was an unemployed construction worker. His wife, Joanna, is a nurse, and for some period it was her earnings that helped to support the family, which also included two young children. Regrettably, Mr. Courtney had another source of income; he became involved in the trafficking of marijuana.

On November 23, 1992, pursuant to a search warrant, the Harford County police seized from the Courtneys' home 35 pounds of marijuana, bonds and stock certificates (the value of which is not revealed in the record), $21,700 in cash, a handgun, and certain drug paraphernalia. Although the full record in the criminal case is not now before us, it appears that the State initially charged Daniel with a variety of drug offenses, including being a drug kingpin (Md.Code, art. 27, § 286(g)). Following his arrest, he was taken to the police station where, with the assistance of counsel, he and an Assistant State's Attorney began negotiating a plea agreement. Such an agreement was eventually arrived at a week later. The core of that agreement, from the State's point of view, was Daniel's cooperation in obtaining evidence "against other defendants whose culpability is equal to or greater than that of [Daniel]."

Undisputed evidence was subsequently presented that, in addition to insisting upon the forfeiture of certain property, the State wanted complete cooperation from Daniel in deciphering cryptic notes in documents seized from his home and with respect to both his suppliers and his customers. Daniel was generally willing to provide the cooperation demanded, including "setting up" drug deals with his suppliers, but he was unwilling to set up drug deals with his customers, whom he regarded as friends. That point was made clear by Daniel's attorney: "We indicated that was not on the table." After many hours of discussion, the parties agreed to specific

language, including that quoted above, which both Daniel and his attorney viewed as not requiring Daniel to set up controlled buys with respect to Daniel's customers, whose culpability would not be "equal to or greater" than Daniel's. There is no evidence that, at the time the agreement was signed, the State had any different view on that point. The final written agreement, which was signed on the evening of November 30, set forth Daniel's obligation to cooperate as follows:

"A. Daniel Courtney shall fully and truthfully respond to all questions put to him by any law enforcement authority. Specifically, he shall fully and truthfully disclose to the State everything he knows concerning the distribution, sale, transportation and use of controlled dangerous substances, or any other information related to his supplier in Baltimore City and Texas. He will further provide information on individuals he supplied.

B. Daniel Courtney shall testify fully and truthfully before Grand Juries and at all trials or hearings resulting from or related to information provided by Daniel Courtney, or when his testimony may be relevant, in the opinion of the State's Attorney."

In return for "the complete fulfillment by Daniel Courtney of all of his obligations under this agreement," which included the cooperation described above, the Courtneys' consent to the forfeiture of the cash found in their home at 1910 Treeline Drive, as well as the home itself, and certain other undertakings not relevant here, the State agreed (1) not to charge Joanna with any offense, and (2) to charge Daniel only with possession with intent to distribute marijuana, accept a plea of guilty to that offense, and recommend a suspended sentence of five years. Additionally, the U.S. Attorney's Office, which was represented in the negotiations, agreed to allow all charges to be prosecuted by the State, and thus to forego Federal prosecution. The Attorney General also agreed not to prosecute Daniel on any criminal charge related to the investigation.

Paragraph 2.C. of the agreement provided:

"Whether or not Daniel Courtney has completely fulfilled all of his obligations under this agreement shall be determined by the Court in an appropriate proceeding at which his disclosures and evidence shall be admissible and at which the State shall be required to establish a breach by a preponderance of the evidence."

In ¶ 3, the Courtneys acknowledged that "any violation of the above stated terms and conditions shall be a violation of this agreement and will result in Daniel Courtney being charged with all criminal offenses which the State, in entering this agreement, waived its right to prosecute against said individual."

Although she had not, at that point, been charged with any offenses, Joanna signed the plea agreement with her husband (and her husband's attorney), presumably to make effective their consent to the forfeiture of some of the property specified in the agreement.

Once the agreement was signed, Joanna and the attorney left the police station, and Daniel underwent an extensive interview by the police. During the course of the conversation, it became clear that the police wanted him to set up controlled buys with one or more of his customers, at which point Daniel balked. He was permitted to stop the interview and call his attorney. The attorney advised him to continue with the "debriefing" and said that he would contact the prosecutor the next day. That, indeed, he did, informing the prosecutor that setting up customers was not part of the bargain. Although not denying that assertion, the prosecutor was adamant that Daniel would have to do as he was told. When defense counsel suggested that there was a misunderstanding and proposed that "we see a judge," which was the remedy provided for in ¶ 2.C. of the agreement, the prosecutor responded that he was "not interested in seeing a judge," and, if Daniel did not agree to set up his customers, the prosecutor was going to have *Mrs.* Courtney "locked up posthaste." In a subsequent complaint for injunctive relief, Daniel and Joanna alleged that the prosecutor in fact threatened to "revoke the

agreement in its entirety, immediately arrest both Mr. Courtney and Mrs. Courtney, place the Courtney's children in foster care and prosecute Mr. Courtney under the Drug Kingpin Statute."

Defense counsel got a reprieve from the prosecutor until 10:30 the next morning so that he could consult with another attorney in his firm. Rather than proceeding immediately to file a motion to have the court determine whether appellant was obliged to make controlled sales to his customers, the attorneys felt constrained to yield to the prosecutor's demands. They were concerned, as was Daniel, over the "catastrophic occurrence to Mrs. Courtney" if the State followed through with its threat to have her arrested: she would most likely lose her job as a nurse. Daniel therefore reluctantly agreed to make controlled sales to at least one of his customers. He had already given the police all of the information they asked for about his customers, as well as about his Baltimore supplier.

Daniel contacted one of the customers, Robert Meehan, as directed by the police. Unknown to them, Joanna, and later Daniel, had already tipped off Meehan, and so the sale did not take place. Meehan said that on the Thursday after Thanksgiving, which would have been on December 3, Joanna called to inform him that Daniel had been arrested, that their assets had been seized, and that the police knew who he was and were after him. She also asked for the money Meehan owed to the Courtneys. Joanna subsequently met Meehan, repeated what she had previously said, and added that "Danny was going to try to set [Meehan] up for a deal in the near future that, and [Meehan] needed to, you know, say [he] wasn't interested, and that [he] would be off the hook, and [he] also gave [Joanna] some money." The next week, Daniel called and confirmed that Meehan was under surveillance, that Daniel was going to set up a deal, and that Meehan was to decline.

Notwithstanding Meehan's refusal to participate in the controlled buy engineered by the police, he was arrested, based,

in large measure, on the information supplied by Daniel. Nonetheless, when the State learned of the Courtneys' communications with Meehan, it declared the plea agreement breached and of no effect. A letter to that effect was sent to counsel for the Courtneys on January 8, 1993.

The Courtneys succeeded in presenting their opposition to the State's action to Judge Waldron, of the Circuit Court for Harford County, in early February, 1993. Following an evidentiary hearing, the court, in findings announced from the bench, declared that Daniel had indeed breached the agreement, thereby justifying the State's response. The court first held that, in fact, Daniel had no obligation under the agreement "to set up the people that he supplied." His only obligation was to supply information, which he had done. It further declared, however, that, when the dispute erupted as to Daniel's obligation, he had the "full opportunity" to seek an interpretation of the agreement from the court "and to stop the State from any action deemed as a bullying." At that point, the court held, there had been no breach of the agreement: "He didn't have the exposure. The issue of getting the wife arrested could have been addressed, also, so they could have come in and seen a judge on an [*ex parte* ] basis, and the judge could have easily interpreted this and shielded the wife."

Instead of taking that available course, the Courtneys chose to warn the target. As to that, the court observed:

"Good faith is an element in every agreement, whether it's a civil type or plea agreement, and it is particularly an element of plea agreements. What the Defendant did, he tipped off someone who he was supplying, so in two ways frustrating the purpose of the information, and he [e]ffectively denied the consideration to the State."

The court viewed that transgression as denying to the State information on the "chain" below Daniel: "he really ended up only delivering one of the people in the net, and in essence closing down the chain below him." Thus, it concluded that Daniel did not act in good faith, that he frustrated the reason for the agreement, and that he should therefore lose the

benefits. An order formally declaring the agreement null and void was entered on February 25, 1993.

Following that ruling, State and Federal agencies proceeded with a vengeance. Through various motions and other papers filed in this Court, including an undisputed affidavit filed by an attorney for the Courtneys, we were informed that both Mr. and Mrs. Courtney were subsequently arrested and charged with a variety of offenses, including being drug kingpins, that both, at least for a time, were held without bail, that their vehicles were seized, and that Federal marshals seized their home in Harford County (1910 Treeline Drive) and other property in Baltimore City. At some point, the prosecutor offered a new plea agreement far more onerous to the Courtneys than the first. Daniel was to plead guilty to importation of marijuana with a recommended sentence of 25 years, all but five years suspended. Joanna would plead guilty to conspiracy to distribute marijuana with a recommended suspended sentence. There would be no agreement as to forfeitures and no constraints on the U.S. Attorney or the Attorney General.

Multiple litigation has now arisen as a result of these events. The criminal cases against the Courtneys brought by the State's Attorney and several forfeiture actions are pending, and the threat of additional prosecutions by the U.S. Attorney and the Attorney General remains. The Courtneys noted this appeal from the February 25 order declaring the plea agreement to be null and void, and, at some point, they filed a separate action to restrain the State's Attorney from prosecuting any civil or criminal action against them until this appeal is resolved. They filed similar motions for injunctive relief in both the criminal cases and in at least one of the forfeiture cases. All of that relief was apparently denied by the circuit court, as it was, preliminarily, by this Court.

### *Appealability*

The State's initial response to this appeal was a motion to dismiss it on the ground that no final or otherwise appealable judgment has yet been entered. The Courtneys contend

that the court's February 25 order is appealable under the collateral order doctrine, as explicated and applied in *Clark v. Elza*, 286 Md. 208, 406 A.2d 922 (1979). The State, in replication, urges that the collateral order doctrine does not apply because (1) the issue sought to be appealed is not separate from the merits of the criminal case, and (2) it would not be effectively unreviewable following the entry of final judgment in that case.

*Clark v. Elza* was a civil case—the Elzas sued Clark for injuries suffered in an automobile accident. On the eve of trial, the parties reached an oral agreement to settle the case for $9,500. The court was notified, the case was removed from the trial docket, and Clark prepared and sent to the Elzas a settlement draft, releases, and an order of satisfaction. The Elzas then repudiated the settlement and returned the papers, whereupon Clark filed a motion to enforce the settlement agreement. The court denied the motion, and this Court dismissed Clark's appeal on the ground that it was premature in that no final judgment had yet been entered.

The Court of Appeals reversed, holding that the ruling was appealable under the collateral order doctrine. Quoting from *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) and *Peat & Co. v. Los Angeles Rams*, 284 Md. 86, 394 A.2d 801 (1978), the Court concluded, at 213, that, to be appealable under that doctrine, " '[T]he order must [ (1) ] conclusively determine the disputed question, [ (2) ] resolve an important issue [, (3) be] completely separate from the merits of the action, and [ (4) ] be effectively unreviewable on appeal from a final judgment.' "

The State does not contest that Judge Waldron's order satisfies the first two of these criteria. It did conclusively determine whether the agreement had any continuing vitality, and that issue is obviously an important one. With respect to the third criterion, the *Clark* Court found that "the questions bearing upon the enforceability of the settlement agreement have absolutely nothing to do with the merits of the tort cause of action," and that those questions were therefore " 'com-

pletely separate' from the principal claim." *Id.,* 286 Md. at 213, 406 A.2d 922. That is also the case here. Whether Mr. or Mrs. Courtney breached the plea agreement has nothing whatever to do with whether they committed the underlying offenses with which they are now charged. It is a "completely separate" issue.

The only criterion in some doubt is the fourth—whether the issue regarding the plea agreement would be effectively unreviewable following the entry of a final judgment. In one sense, it *would* be reviewable. If Daniel or Joanna Courtney is convicted and appeals, he or she could raise the issue of whether the State was bound by the plea agreement, and if we were to conclude in that appeal that the State *was* so bound, we would be obliged to reverse any convictions other than the one bargained for in the plea agreement. *See State v. Brockman,* 277 Md. 687, 357 A.2d 376 (1976). That, indeed, is the basis of the State's argument. It is too narrow a reading of the fourth criterion, however. As the *Clark* Court noted, 286 Md. at 213, 406 A.2d 922:

> "[A] final judgment on the merits of the underlying tort claim would render the ruling on the settlement agreement effectively unreviewable. One of the principal considerations in entering a pre-trial settlement agreement is the avoidance of the expense and inconvenience of a trial. If the defendants must proceed to a trial on the merits, this contractual benefit will be irretrievably lost. Regardless of the outcome of the trial or the outcome of an appeal after trial, the defendants will have been forced to go to trial and thus will have been deprived of a right under the contract if the contract should have been enforced."

Although, as noted, *Clark v. Elza* was a civil case, the collateral order doctrine is by no means limited to civil cases. It applies as well to criminal actions, *Parrott v. State,* 301 Md. 411, 483 A.2d 68 (1984), and we see no reason why this aspect of it should not also apply in criminal actions. The motives that impel civil litigants to settle their disputes without trial are equally at work in criminal cases; indeed, for the defen-

dant, the consequences of eschewing or rejecting a plea agreement may be far more onerous than those faced by a recalcitrant civil litigant.

Those consequences are, in fact, multiplied here. Not only is Daniel Courtney facing a barrage of very serious charges, but Joanna, who was to remain free of prosecution under the agreement, is now charged as a drug kingpin. Several items of property have been seized and are subject to forfeiture. The validity of the plea agreement could thus be an issue in not just one, but several, appeals arising in different contexts and possibly upon different evidence. The effectiveness of any post-final judgment review of Judge Waldron's decision is especially tenuous. We therefore conclude that the order is immediately appealable under the collateral order doctrine.

## The Merits

In *State v. Brockman, supra,* 277 Md. 687, 357 A.2d 376, the Court summarized the basic ground rules governing the negotiation and enforcement of plea agreements. At 697, 357 A.2d 376, it noted that "the standard to be applied to plea negotiations is one of fair play and equity under the facts and circumstances of the case, which, although entailing certain contract concepts, is to be distinguished from . . . the strict application of the common law principles of contracts." In furtherance of that concept, the Court held, at 698, 357 A.2d 376, that "when a plea bargain has been agreed to by both a proper representative of the State and a defendant, and is not in violation of any law or public policy of this State, it would be a grave error to permit the prosecution to repudiate its promises in a situation in which it would not be fair and equitable to allow the State to do so."

In *Brockman,* as here, a plea agreement was reached that required the defendant to cooperate with the State in developing a case against other persons. Brockman hesitated for a brief period in identifying a picture of one of the targets, and the State repudiated the agreement. The circuit court denied Brockman's motion for relief, agreeing with the State that

Brockman had breached the agreement. The Court of Appeals reversed. Noting that, prior to the repudiation, Brockman had given the State a good deal of incriminating information and characterizing Brockman's hesitation as an inconsequential misstep, the Court declared that it would be inequitable to permit the State to repudiate the agreement.

We believe that the same principles apply here. The evidence showed, and the court found, that Daniel Courtney was not obliged by the agreement to set up controlled buys with his customers. That exception from the general obligation to cooperate had been bargained for by Daniel and accepted by the State. When the Assistant State's Attorney who had negotiated the agreement and who was fully aware of Daniel's position in the matter nonetheless (1) insisted that he proceed to participate in such controlled buys or face the immediate arrest of his wife and (2) declined defense counsel's request that the matter be presented to a judge, the State breached the agreement. The effect was to coerce Daniel into performing an act that he was not obliged to perform, which, in our view, was unfair and inequitable and constituted a material violation of the agreement.

As we have observed, there is not even a pretense in this record that the prosecutor honestly or reasonably believed that the agreement required Daniel to participate in controlled buys with his customers. Had that been the case, he would not have rejected defense counsel's request to present the matter to a judge. Rather, the record reveals a clear, deliberate, gross repudiation of a bargained-for limitation in the agreement.

We disagree with the circuit court's conclusion that the prospect of an *ex parte* application to a judge meant that "[t]here had been no breach yet as of that point in time." The breach occurred when the prosecutor threatened to have Joanna arrested if Daniel did not participate in a controlled buy with his customers. The possibility that a judge, if available on such short notice, might then have construed the agreement favorably to the Courtneys, as Judge Waldron

ultimately did, provided a possible remedy for the breach, but it did not erase or excuse the breach. We also disagree with the court's conclusion that the tip-off of Meehan denied the State the bargained-for consideration. Before that occurred, Daniel gave all of the information requested by the State, including sufficient information to justify Meehan's arrest. Daniel, in other words, gave the State all of the cooperation it was entitled to under the agreement.

We do not condone the subsequent conduct of the Courtneys, although that conduct does have to be viewed in the light of their reasonable belief that they were under no obligation to proceed with the controlled buy in the first instance. The fact is that the agreement was breached by the State before any of that conduct occurred.

We are not unmindful that, in order to combat this awful drug epidemic, there must be vigorous prosecution of offenders and that it is not inappropriate for the Government, when it arrests one, to put pressure on him to assist in developing cases against other offenders. But, when entering into plea agreements, the State, as well as the defendant, must play by the rules. Prosecutors cannot expect the law to hold defendants to their agreements if it does not also hold prosecutors equally accountable.

We shall reverse the order of February 25 declaring the plea agreement null and void and remand the case for such further proceedings as may be necessary to implement that agreement.

ORDER OF FEBRUARY 25, 1992 REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; HARFORD COUNTY TO PAY THE COSTS.