706 A.2d 156

**Valentino Maurice JACKSON**

v.

**STATE of Maryland.**

**No. 819, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Feb. 27, 1998.

Gregory E. Flynn, Rule 16 Student Atty. (Stephen E. Harris, Public Defender and Nancy S. Forster, Asst. Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen. and Marna McLendon, State's Atty. for Howard County, Ellicott City, on the brief), for appellee.

Submitted before MOYLAN, EYLER and SONNER, JJ.

EYLER, Judge.

Appellant, Valentino Maurice Jackson, was charged with child sexual abuse and related offenses. On appeal, we are asked to determine if the trial court erred in denying appellant's motion to enforce an agreement with the State and to dismiss the charges against him. Before doing so, we must consider whether the issue is properly appealable at this time. For reasons discussed below, we hold that the issue is appealable, and we affirm the trial court's ruling.

## Facts

On March 14, 1997, appellant appeared before the Honorable Lenore R. Gelfman in the Circuit Court for Howard County to argue certain defense motions. As of that time, the trial was scheduled for March 24, and the *Hicks*[1] deadline was April 28th. One of the matters argued at the March 14 hearing was appellant's request to review the victim's Department of Social Services records. Counsel for the parties agreed that Judge Gelfman should review the records *in camera* before making the determination. Judge Gelfman then stated:

I'm just wondering the best way, the most efficient way, the quickest way to review the information and get you the

---

1. Md.Code Ann. art. 27, § 591 (1996 Repl.Vol.) and Md. Rule 4–271 provide that trial must be held not later than 180 days after the appearance or waiver of counsel and the appearance of the defendant unless postponed for good cause by the administrative judge or his or her designee or the requirement is waived by the defendant. This date has come to be known as the *Hicks* date in recognition of the fact that the Court of Appeals, considering the former rule and statute, held in *State v. Hicks*, 285 Md. 310, 403 A.2d 356 (1979), that this rule is not merely directory but is mandatory.

Court's decision and still give you time to review any evidence if in fact the Court orders that it be disclosed.

The prosecutor subsequently informed Judge Gelfman that there would be a request for a new trial date, and after discussion, counsel agreed on May 5 as the new trial date. With respect to *Hicks,* the following colloquy occurred:

[PROSECUTOR]: We do have a Hicks problem at the end of April, I believe, so we need to get it in some time in April. I'm not suggesting a trial date. I'm just saying that that—I would mention that to the Court.

\* \* \* \*

[DEFENSE COUNSEL]: I think with regard to the Hicks problem I—you know, consistently in my practice have taken the position that that oughten to drive anything. I mean, in other words, we'll waive whatever we have to waive to avoid a Hicks problem. This case is not going to go away because it doesn't get to trial. I mean, so I think what we ought to be talking about is what's a time frame in which to get done the things that need to get done to get this case prepared for trial, and then if it happens to be after the date that—that Hicks run, we'll waive, do whatever waiver we have to do with regard to that.

THE COURT: Okay. I don't know if therefore you are saying that Defendant waives Hicks if and when it becomes an issue.

[DEFENSE COUNSEL]: I will waive Hicks if it becomes an issue.

THE CLERK: April 28th is the Hicks date.

THE COURT: Okay, that was the next question.

[DEFENSE COUNSEL]: Is there—what's the—I have to be out of the country on assignment the week before, not on vacation. The—with regard to something else I'm doing. What's the—the—is there a week after that? What's the Monday—

THE CLERK: (Indiscernible).

THE COURT: What is the trial date presently?

[PROSECUTOR]: 24th of March.

(Asides.)

[DEFENSE COUNSEL]: No, I don't have any problem right now during that week.

THE COURT: Which week?

[DEFENSE COUNSEL]: May 5th.

[PROSECUTOR]: Now, that is after Hicks.

THE COURT: That's after Hicks.

[DEFENSE COUNSEL]: I know that is after Hicks.

[PROSECUTOR]: May 5th is the week I'm in court, so that is convenient.

[DEFENSE COUNSEL]: Okay.

[PROSECUTOR]: I'm only saying that. I mean, we can—

[DEFENSE COUNSEL]: I understand. I understand. I don't have any problem.

Appellant was then advised of his right to be tried within 180 days of an appearance. As a result of the colloquy which followed, Judge Gelfman found that appellant waived that right. The relevant portion of the transcript is as follows:

[DEFENSE COUNSEL]: Okay. Mr. Jackson, do you understand—I've just explained to you that the State has an obligation to bring you to trial within a hundred and eighty days of your—of the—in this case of the entry of our appearance in October which would run at the end of April. Do you understand that?

THE DEFENDANT: Yes.

[DEFENSE COUNSEL]: They must by law do that. Do you understand that if we set the trial date on May the 5th, which we are agreeing to at this point, do you understand that would be beyond that date?

THE DEFENDANT: Yes.

[DEFENSE COUNSEL]: And that in order for the Court to set it on that date you must understand that you are waiving your right to a speedy trial as that is determined— as that is set forth in Maryland law. You are waiving your right to be tried within one hundred and eighty days of our

appearance which would be before the end of April. Do you understand that?

THE DEFENDANT: Yes.

[DEFENSE COUNSEL]: And understanding then do you knowingly waive your right to be tried within a hundred and eighty days and accept the court's trial date of May 5th, 1997?

THE DEFENDANT: Yes, I do.

THE COURT: Sir, you're not under the influence today of any alcohol, drugs or medication prescribed or otherwise?

THE DEFENDANT: No, ma'am.

THE COURT: Are you being treated for any psychiatric illness at this time or taking any medication?

THE DEFENDANT: No. Well, I'm seeing a psychiatrist, you know.

[DEFENSE COUNSEL]: He's been getting drug counseling, but that's not for any mental impairment.

THE COURT: Do you—do you find that that interferes with your ability to understand what is being said to you?

[DEFENSE COUNSEL]: No, ma'am.

THE COURT: Do you understand everything that [defense counsel] has said to you and you agree to have this case tried on May 5 which is later than the date that ordinarily would have been set in this case?

THE DEFENDANT: Yes.

THE COURT: Now, I'm just being—okay. Let me make a finding. Defendant waives Hicks. New trial date May 5, 1997. Let me inform Counsel that on May 5 Judge Leasure is the principle [sic] criminal judge, and Judge Sweeney is the backup criminal judge. So it more likely than not will be one of those particular judges.

On April 14, 1997, the State filed a motion to reschedule the trial from May 5 to a date prior to the *Hicks* deadline. On April 25th, Judge Gelfman held a hearing on that motion. At the hearing, Judge Gelfman was advised of the existence of an agreement that had been reached on March 14 between

counsel for the parties but had not been disclosed at that time. Counsel revealed that, on October 23, 1996, the victim's mother had given a bed sheet to the police with an explanation that it had been on the bed when and where the victim had been molested. The bed sheet contained a stain that the State wanted to have subjected to DNA testing. At the April 25 hearing, the prosecutor explained:

Your Honor, when the State filed the Motion after receiving the information back on the sheet, having there been an agreement on the 14th of March, when we were last before the Court. At that time, as the Court recalls, there were various Motions filed by the Defense and there were various materials that the Court was going to review in camera to determine what could be released and what couldn't be released.

And on the 14th of March, which was ten days before the then scheduled trial date, the State at that time did in the middle of the Motions agree with the Defense that the trial date of the 24th would be continued, and that if the information came back on the—on the white fitted bed sheet which excluded the Defendant, the State would dismiss the case.

When that information came back to the State the D.N.A. came back on two different items. One was dated the 13th of March and one was dated the 17th of March. The State was away—this Prosecutor was away the week of the 17th as was told to the Court and to the Defense on the 14th.

We did not get the information from the Maryland State Police—the State's Attorney's Office did not get the information from the Maryland State Police until either the 24th or 26th of March, which was the following week after I returned from the State's Attorney's business out-of-state. And the results came back that the particular white fitted bed sheet had excluded Mr. Jackson caused some concern with the State.

I discussed the matter at length with the State's Attorney—with the Deputy State's Attorney, with the Detective, and then I had to meet with the victim's mother.

When I met with the victim's mother on the 8th of April and I advised the Defendant I was—Defense attorney I was going to meet with the victim's mother, it was determined for the first time, the State's Attorney's Office got additional information, that this white fitted bed sheet which had been alluded to in police reports much earlier as being identified by the victim as her bed sheet and as being the bed sheet that was on her bed when various crimes against her had been committed by the Defendant, it had come to the State's attention—State's Attorney's Office attention on April 8th that this sheet had been used somewhere else. It had been used on the sofa. The sofa had been used by victim's mother and someone who she had been seeing at the time.

As a result of that additional information the State's Attorney's Office advised the Defendant through his Counsel, we were not going to honor the agreement of the 14th and that we were going to proceed forward with the case.

Defense counsel responded:

The only thing that in—you're correct that the agreement itself was never put on the record. Reference was made to the agreement with regard to the continuance.

\* \* \* \*

On the 14th, ten days before trial, we sat in that room and we reviewed every element of where this case sat, including the importance of the D.N.A. on this white fitted bed sheet which according to their evidence was—the victim was going to testify was on her bed when in fact these—some or all of these acts occurred, the ones that occurred on her bed.

We discussed openly the fact that if that white fit—the D.N.A. came back on that white fitted bed sheet with our client's semen stains on it, that by the time this case got to trial that white fitted bed sheet was going to be like a second skin on that little child.

We also discussed that if the white—if the D.N.A. came back contrary to our client, excluded our client, all of a

sudden everybody was going to distance themselves from the white fitted bed sheet. This was the nature of the kinds of discussions that we had.

[The prosecutor] then asked us, [other defense counsel] and I, after discussing every element of this case, the weaknesses in the case, the strengths of the case, the problems with both sides and where we stood as we were about to come into court, whether we would consider a continuance in this case because there were, as a result of our discussion, some outstanding matters, not the least of which was the D.N.A. And in fact, we had even alluded to the fact that if the D.N.A. came back in the week prior to trial that we would do everything we could to exclude the results of that D.N.A. because this D.N.A., the material from which the D.N.A. was to be taken, has been available since October the 24th, as has virtually every question dealing with this white fitted bed sheet, been available to the State since October 24th.

We have sought in every way we could to get them to do their work. In fact, this case was continued back in January, among other things, precisely so the D.N.A. could in fact—so the D.N.A. results would be available.

We discussed all this. [The prosecutor] said, would you consider a continuance? I said, give me a minute to talk with [other defense counsel]. The two of us talked and we came back to [the prosecutor], and we sat back there in that room. We will not agree to a continuance except under one circumstance and one circumstance alone. The circumstances is (sic) that if the D.N.A. on the white fitted bed sheet comes back and excludes our client you will dismiss this case. Otherwise, we will not agree to a continuance.

THE COURT: But suppose they have other evidence.

[DEFENSE COUNSEL]: That could—that—they could—they had other evidence. We all knew what the other evidence was at the time.

There are fundamental weaknesses in this case and [the prosecutor] was aware of them and we had just discussed

them. If the D.N.A. came back our client's way, it weakened an already weak case from our p[er]spective, and apparently from [the prosecutor's] p[er]spective on March the 14th.

He made an agreement. He stood up to us and said at that time—let me just finish the recitation because it is important what happened.

At that time, on March the 14th, he stood up and he said to us, let me think about it, as we left the room back there. Everything had been discussed. That was the agreement.

We did not ask for a continuance in this case. We came into court fully prepared to go to trial. We asked the Court to make the rulings that the Court—we've been asking the Court to make. The Court then, on the Court's own Motion said, well, what are we going to do about the trial date in this case? Perfectly legitimate, raising an issue, since we seemed to be—we had some things that had to be resolved, or arguably had to be resolved before trial. What are we going to do about the trial date?

I was standing right here. I said—I asked the Court for leave to speak with [the prosecutor]. I walked across the courtroom and I said to him, do we have an agreement? At which time, he said—thought for a moment and he said, yes. And I said to him over there as I was—right over there said—and the agreement is, without any question if the—if we will do whatever we need to get the continuance, to get you the continuance that you want, we will do that, we'll waive *Hicks*, we'll do whatever we have to do, if you will agree that if the semen comes back on the white fitted bed sheet and excludes our Defendant, and only the white fitted bed sheet, excludes our Defendant, you will—the case will go away, is the words I used at that moment. But after our meeting there's absolutely no question about what that meant. It meant that the case would be dismissed, and [the prosecutor] knew that. He acknowledged that.

I walked back here. I asked leave of the Court one more time to explain exactly what was going on to my client because we recognized there was a *Hicks* problem. There

was then a voir dire. We agreed to a continuance of this case. We agreed to a continuance of the case beyond *Hicks*.

Judge Gelfman, after listening to argument of counsel and after listening to the tape of the March 14th hearing, found as follows:

[F]irst of all, I don't know why the State filed the request to reset the trial date. I didn't see a *Hicks* problem in the first place. And I guess the State was just trying to be extra cautious, but there's no *Hicks* problem. The critical event is not when the trial date is, the critical event is when the postponement occurred. The postponement had to occur for several reasons, not the least was the D.S.S. records. Why did the D.S.S. records have to be reviewed? Because there's a statute that precludes the Department of Social Services from releasing sensitive and confidential information. It is a criminal statute. Therefore, D.S.S. intervened to ask the Court to either file a Protective Order or to review the information in camera and make its ruling accordingly.

Why did D.S.S. intervene? D.S.S. intervened because the Defense subpoened Susan Glorioso and the other D.S.S. officials. She's not going to—Ms. Glorioso who I believe is a licensed social worker for the—or investigator for D.S.S. cannot under penalty of criminal sanction divulge any of the information absent Court Order. It was occasioned by the Defense's request. There is no *Hicks* problem. Defendant did in fact waive *Hicks* but it wouldn't have been a problem anyway in my opinion because there was sufficient good cause to have the trial date on May 5.

Now, whether or not there was an agreement between Defense and State, I don't know. There's going to have to be a full, perhaps, evidentiary hearing on that issue. But the fact of the matter was, I think it's kind of [naive], frankly for Counsel to think that if the State comes back with one piece of information that says it exculpates your client that they're not going to go forward. They could have said that on the record, Your Honor, we're waiting for

some D.N.A. information. If in fact it comes back negative on Mr. Jackson, we don't have a case. They could have said that. They didn't. They apparently have other information. And I will tell you from the benefit of having reviewed the D.S.S. records both the Defense has valid information to present, and I must tell you, the State has very valid information to present. For all these reasons, the Motion to reset the trial date is denied. Motion to dismiss the case is denied. Trial goes forward on May 5.

Based on the above, Judge Gelfman refused to reschedule the trial date.

Appellant filed a motion to dismiss the indictment and to enforce the alleged agreement. That motion was heard by the Honorable Dennis M. Sweenet on May 5, 1997, and testimony was taken. The victim's mother testified that the sheet in question had been used occasionally on the sofa on which she slept and that she had had sex with partners other than appellant. Counsel for both parties testified with respect to the terms of the alleged agreement between them. At the conclusion of the hearing, Judge Sweeney denied appellant's motion to dismiss on *Hicks* grounds, based on its finding that Judge Gelfman had ruled on April 25 that appellant had waived *Hicks* on March 14, and alternatively, independently found that appellant had waived *Hicks* on March 14. Judge Sweeney expressly did not decide whether Judge Gelfman had made a good cause finding to justify postponement of a trial date beyond the *Hicks* deadline.

With respect to appellant's motion to enforce the agreement and to dismiss the indictment, Judge Sweeney found that the State had agreed that, if the DNA results were negative, the charges against the appellant would be dismissed. He further found that consideration for that agreement existed, in that appellant agreed not to oppose a postponement of the then existing trial date. In sum, Judge Sweeney found the existence of an agreement and that it had been breached by the State. He went on, however, to find that appellant had suffered no prejudice from the delay, concluded that dismissal

of the charges was not justified, and denied appellant's motion to dismiss.

Later that day, the Acting Administrative Judge granted a postponement of trial pending appeal so that appellant could file this immediate appeal.

## Discussion

### A. Appealability

■ The State moved to dismiss this appeal on the grounds that the appeal is interlocutory and not allowed by law. It argues that there is no final judgment in a criminal case until a verdict has been rendered and sentence has been imposed. *See Greco v. State,* 347 Md. 423, 432 n. 4, 701 A.2d 419 (1997); *Telak v. State,* 315 Md. 568, 575, 556 A.2d 225 (1989). Appellant responds that the denial of appellant's motion to dismiss is appealable under the collateral order doctrine. We agree.

■ An otherwise interlocutory order is appealable under the collateral order doctrine if it

(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue, (3)[is] completely separate from the merits of the action, and (4)[is] effectively unreviewable on appeal from a final judgment.

*Courtney v. Harford County,* 98 Md.App. 649, 635 A.2d 8 (1994). The State concedes that the order meets the first two prongs of this test. Accordingly, we need discuss only prongs three and four.

Clearly, the merits of appellant's motion to dismiss is completely separate from the merits of the criminal proceeding against him. The enforceability of the agreement between appellant and the State has no bearing upon appellant's guilt or innocence on the criminal charges. *See Clark v. Elza,* 286 Md. 208, 213, 406 A.2d 1922 (1979)(holding that merits of enforceability of settlement agreement are completely separate from merits of underlying tort claim); *Courtney,* 98 Md.App. at 657–58, 635 A.2d 8 (holding that enforceability of

agreement between defendant and State was completely separate from merits of criminal proceedings against defendant).

A closer question is whether the agreement would be effectively unreviewable following the entry of a final judgment. For reasons similar to those set forth in *Courtney,* we hold that it would be.

*Courtney* involved the enforcement of a plea agreement. The defendant in that case had been charged with a variety of drug related offenses, including being a drug kingpin (Md. Code, art. 27, § 286(g)). The defendant agreed to provide the State with testimony implicating others in drug charges in exchange for a promise by the State not to charge the defendant's wife with crimes, acceptance by the State of a guilty plea on possession of marijuana with intent to distribute, dismissal by the State of the other charges, and recommendation by the State of a suspended sentence of five years. The State breached the agreement, the defendant sought injunctive relief, and the trial court declared the agreement to be null and void. Thereafter, the defendant filed an immediate appeal.

In considering whether the order met the fourth criterion of the collateral order doctrine, we noted that, in one sense, the agreement would be reviewable on appeal of any convictions because, in the event that we found the State was bound by the agreement, we would be obliged to reverse any convictions other than the one bargained for in the plea agreement. *Id.* at 658, 635 A.2d 8. We further stated, however, that such a reading of the fourth criterion was too narrow. We used a quotation from *Clark* to explain:

"[A] final judgment on the merits of the underlying tort claim would render the ruling on the settlement agreement effectively unreviewable. One of the principal considerations in entering a pre-trial settlement agreement is the avoidance of the expense and inconvenience of a trial. If the defendants must proceed to a trial on the merits, this contractual benefit will be irretrievably lost. Regardless of the outcome of the trial or the outcome of an appeal after

trial, the defendants will have been forced to go to trial and thus will have been deprived of a right under the contract if the contract should have been enforced."

*Id.* (quoting *Clark,* 286 Md. at 213, 406 A.2d 922). Relying upon this reasoning, we held that delaying consideration of the agreement until after any convictions would deprive the defendant of the benefit of his bargain. Indeed, we noted, the consequences for the Courtneys, and criminal defendants generally, were much more onerous than those faced by a recalcitrant civil litigant. *Id.* at 658–59, 635 A.2d 8.

The State attempts to distinguish *Courtney* on the basis that the agreement at issue in this case "did not implicate a plea to some lesser offense, and was not taken primarily in an effort to avoid the expense and inconvenience of a trial." First, we note that the holding in *Courtney* did not turn on the fact that the bargain included a guilty plea. Accordingly, lack of a guilty plea in the instant case does not distinguish this case from *Courtney.* Further, contrary to the State's assertion, the record reveals that dismissal of the charges and avoidance of trial is precisely what appellant was seeking when he entered into the bargain with the State. If we refused to consider the appeal at this time, appellant would be forced to face trial for alleged sexual crimes upon his young daughter. Regardless of any ultimate disposition in his favor, merely participating in such a trial would deprive appellant of a right under the contract, should the contract have been enforced. Accordingly, we hold that the order is immediately appealable.

## B. Enforceability of Agreement

At the hearing on appellant's motion to enforce the agreement and dismiss the indictment, the trial court (Sweeney, J.) found that a valid agreement existed between the parties whereby the State promised to dismiss the case against appellant if the DNA analysis of the bed sheet resulted in the exculpation of appellant, in exchange for appellant's agreement not to oppose the State's request for a postponement of the trial. The trial court further found that appellant per-

formed his part of the bargain by taking the position he did with respect to the issue of postponement. Nevertheless, after considering all of the circumstances and balancing the interests of the State against any detriment to appellant, the trial court held that the State's breach did not justify the extraordinary remedy of dismissal of the criminal charges. More specifically, the trial court stated as follows:

The question then becomes, in this Court's view, as to what action, if any, the Court should take as a result of finding that there was an agreement and that it had the contours that it did. And this is in the context of the case being set on March 14th with a trial date of May 5th, and the parties being in the posture to which they have testified today. It is not every agreement that necessarily may be made between the State's Attorney and a defendant that would meet the criteria for being an enforceable agreement by this Court; and there is a wide area, in this Court's view, where the Court has discretion in considering the totality of the circumstances and the interest of justice.

\* \* \* \*

Now, turning to this case, the agreement that was reached in this case was clearly, in this Court's opinion, breached by the State, and I don't believe the testimony has really supported an alternative conclusion; and there has not been an argument that [the prosecutor] was not speaking for the State's Attorney's Office and that he was not authorized to make the agreement that he did. And the Court believes that the State's Attorney's Office supplied him with the authority to enter into the agreement that he did. The question becomes—if there was a breach of the agreement, as the Court believes there was, what action if any should be taken by this Court. This enters the area of the considerations of what has the defendant lost as a result of this breach of the agreement. The defendant claims that the detrimental reliance that the defendant has placed on this and the reason that the defendant has suffered as a result of this agreement, revolves not only around the harm

of having the charges still pending, which is something that ought to be taken into consideration, but that the State has had additional time to prepare and to reconfigure its case and to better prepare for this case than it would have had on March 14th. It is clear in this Court's finding that [the prosecutor] was, in fact, seeking a postponement. The Court, however, does not find there to be particular evidence of any defects in the State's case beyond not having the DNA back. And, in fact, as to that point about not having the DNA back, the defendant has now ended up, in the Court's view, in actually a more favorable position as a result of having the DNA come back since that piece of evidence—which the State obviously having sent out for analysis was hopeful would present evidence that would implicate the defendant if the State's theory was correct—has now proven to exclude the defendant from that particular item and potentially to present exculpatory information. The defendant has also cited the delay that has been occasioned as a result of not being able to press ahead on March 14th. This is, the Court views, separate and apart from the automatic arguments made in the *Hicks'* arguments that the very delay itself here is of constitutional concern and constitutional dimensions. The Court does not find that the delay from March 14th to May 5th has been demonstrated to be of such a nature that there is any detriment of any significant degree to the defendant from the mere fact of the delay. The Court notes, in this Court's view, and the Court finds that it is very likely that even without the defendant having supplied the *Hicks* waiver that it is very likely that this case would have been—if not put beyond *Hicks* for the good reasons that Judge Gelfman has specified on the record of both the March 14th and the April 25th hearings but, at a minimum, if not pushed beyond *Hicks* to a date like today, it would have been put in a posture where it would have been right up against the *Hicks* deadline. . . .

. . . The Court does not believe, however, in balance, in considering the circumstances and the cases that have been

cited, that the extraordinary remedy of the Court acting to dismiss a criminal indictment is a remedy that is justified by the State's breach, any harm to the—a demonstrable harm to the defendant as a practical reality or by the public policy and purposes involved. For those reasons the defendant's motion is denied.

■ Relying upon *State v. Thompson*, 48 Md.App. 219, 223 n. 1, 426 A.2d 14 (1981), appellant argues that the agreement is a plea agreement. Appellant further argues that plea agreements are entitled to judicial enforcement, and that, in view of the trial court's finding that there had been a valid agreement that had been breached, the trial court erred when it refused to enforce the agreement by dismissing the charges. The State responds that the agreement is not a plea agreement, that appellant did not give up anything by agreeing to the postponement, and that, in light of that fact and the seriousness of the charges, the trial court was correct in refusing to dismiss the charges.

■ Appellant is correct that when a guilty plea is entered in reliance upon a promise by the State and the State later breaches the promise, the defendant ordinarily may elect between vacating the plea or specifically enforcing the State's promise. *State v. Brockman*, 277 Md. 687, 694, 357 A.2d 376 (1976); *Miller v. State*, 272 Md. 249, 253–55, 322 A.2d 527 (1974); *Custer v. State*, 86 Md.App. 196, 202, 586 A.2d 51 (1991). *See also State v. Parker*, 334 Md. 576, 597, 640 A.2d 1104 (1994) ("Generally, courts will not tolerate broken plea agreements. . . ."); *State v. Poole*, 321 Md. 482, 496, 583 A.2d 265 (1991) ("[W]here a guilty plea was induced by a promise or agreement by the State, that promise must be fulfilled"). We agree with the State, however, that the agreement at issue was not a plea agreement within the meaning of these cases.

In *Butler v. State*, 55 Md.App. 409, 462 A.2d 1230 (1983), we commented on the importance of maintaining the distinctions between grants of immunity, plea bargains, and other miscellaneous bargains between the State and criminal defendants.

*Id.* at 416–17, 462 A.2d 1230. With respect to plea bargains, we noted the following:

"Plea bargain" is . . . a term of art that should be used with care and precision. In *Gray v. State*, 38 Md.App. 343, 356 [380 A.2d 1071] (1977), this Court, speaking through Judge Wilner, defined this term of art:

"Traditionally, a 'plea bargain' or 'plea agreement' contemplates a conditional plea of guilty or nolo contendere to one or more pending charges, the condition usually being either the dismissal or lessening of other charges by one means or another, or some concession being made with respect to disposition, or both."

*Id.* at 423, 462 A.2d 1230. We went on to note that the jurisdictional predicate for the trial court's power to enforce plea agreements is that the trial court must satisfy itself that the plea was voluntarily entered into. *Id.* at 424, 462 A.2d 1230. "A breach by the State of its part of the bargain negates the voluntariness of the plea and justifies its withdrawal." *Id.* We further contrasted plea agreements with other miscellaneous agreements as follows:

In yet another significant regard, the plea bargain contrasts with other miscellaneous bargains. The interest of the courts in the plea bargaining process is based not so much on the equitable notion that every suspect citizen be treated fairly by the elected prosecutor but rather on the credibility of the plea bargaining process and the indispensable role that that process plays in the management of an otherwise overwhelming caseload.

\* \* \* \*

On the only occasion when the Supreme Court has ventured to oversee the performance by the prosecutor of his part of a bargain, it has been within the clear context of the formal offering and accepting of a plea of guilty. *Santobello v. New York*, [404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) ]. On virtually every occasion when the appellate courts of this State have ventured to oversee the perfor-

mance by the prosecutor of his part of a bargain, it has been within the clear context of the formal offering and accepting of a plea of guilty. [Citations omitted.]

*Id.* at 425–27, 462 A.2d 1230. *See also Parker*, 334 Md. at 597–98, 640 A.2d 1104 (noting importance of plea agreements in disposing of criminal charges); *Poole*, 321 Md. at 496, 583 A.2d 265 (noting that "integrity of the plea bargaining process can only be maintained when the *quid pro quo* is fulfilled").

While it is true that in *Thompson,* we used the term "plea bargain" to describe an agreement that did not include a plea of guilty, we noted that we were "us[ing] the term 'plea bargain' in its broad sense as meaning any agreement between the prosecutor and the defendant whereby a defendant agrees to perform some act or service in exchange for more lenient treatment by the prosecutor." 48 Md.App. at 222 n. 1, 426 A.2d 14. Despite our use of the term "plea bargain" in *Thompson,* in *Butler,* we expressly characterized the *Thompson* bargain as a miscellaneous bargain.[2] 55 Md.App. at 428–30, 462 A.2d 1230.

The State's initial contention is correct. The agreement before us is a miscellaneous bargain as it did not include a guilty plea to any of the criminal charges. In fact, the agreement is distinguishable from plea bargains in at least three salient respects.

First, as we just noted, plea bargains serve an indispensable role in our criminal justice system by disposing of a large percentage of our criminal cases. *Parker*, 334 Md. at 597–98, 640 A.2d 1104; *Allgood v. State,* 309 Md. 58, 66, 522 A.2d 917 (1987); *Brockman,* 277 Md. at 692–93, 357 A.2d 376. The agreement at issue, while serving the convenience of the prosecutor in this particular case, is not a type of agreement

---

**2.** Although the bargain in *Thompson* was a miscellaneous bargain, rather than a plea bargain, it justified judicial enforcement. The bargain implicated the court process because it involved removal of criminal charges from the stet docket. *Butler,* 55 Md.App. at 429–430, 462 A.2d 1230. Further, under the extraordinary circumstances of the case, the granting of the extraordinary relief of dismissal was not an abuse of discretion. *Id.* at 430, 462 A.2d 1230 (discussing *Thompson* ).

that serves a similar systemic purpose. Indeed, while plea agreements promote judicial efficiency and expediency, and are to be encouraged, agreements which include waivers of *Hicks* actually work against judicial efficiency and expediency.

Second, the terms of a plea bargain must be presented to the trial judge, and the judge must then accept or reject the plea in order for it to be binding on the court. Rule 4–243; *State v. Sanders,* 331 Md. 378, 381, 385, 628 A.2d 209 (1993). The trial court, in a very real sense, becomes a party to the plea agreement. By contrast, in the instant case the trial court was not even informed of the existence of the agreement until after the breach.

Finally, the entry of a plea is a waiver of a criminal defendant's Fifth Amendment right against self-incrimination and Sixth Amendment right to trial by jury. *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970). Thus, where the waiver rests upon a promise that is breached by the State, the defendant's constitutional rights are violated. *Miller,* 272 Md. at 255, 322 A.2d 527 (quoting *Santobello,* 404 U.S. at 268, 92 S.Ct. at 502). By contrast, a waiver of *Hicks* does not necessarily implicate a defendant's constitutional rights. Specifically, Article 27, § 591 and Rule 4–271 are not merely codifications of constitutional speedy trial analysis, but rather, are rigid time requirements enforceable regardless of any lack of constitutional violations. *See Goins v. State,* 293 Md. 97, 109, 442 A.2d 550 (1982); *Franklin v. State,* 114 Md.App. 530, 534, 536, 691 A.2d 257, *cert. denied,* 346 Md. 241, 695 A.2d 1229 (1997). Notwithstanding these differences, the agreement still may be entitled to judicial enforcement.

As we noted in *Butler,* the category of "miscellaneous bargains" is a broad category that includes agreements involving acts within the unfettered control of the defendant or State, and agreements with some judicial involvement. 55 Md.App. at 428, 462 A.2d 1230. The former type of agreement is not judicially enforceable. *Id.* at 428, 431, 462 A.2d 1230. No matter how egregious the State's breach in any

particular case, the judicial branch may not become involved in the enforcement of such agreements. *Id.* When, however, the agreement implicates the court process, a breach by the State will trigger judicial intervention. *Id.*

More specifically, the ultimate inquiry is whether a breach by the State implicates the due process clause. As we explained in *Butler,*

> [i]n sorting out those bargains between prosecutor and suspect that are indisputably beyond the pale of judicial intervention from those other bargains that might arguably fall within the jurisdiction of the criminal court, the infallible criterion is the involvement of the due process clause. Where the thing the suspect arguably bargained for and was arguably denied does not relate to a criminal charge against him, there can be, by definition, no claim that he has been denied life, liberty or property without due process of law. A necessary, although not always sufficient, condition for judicial intervention is the presence of criminal charges against the bargaining suspect. The ensuing question then becomes whether that suspect was somehow denied life, liberty or property by virtue of his reliance upon the false promise of the State's Attorney. Jurisdiction to intervene is rooted in the due process clause.
>
> Where a criminal charge and, therefore, the due process clause are not involved, the inquiry is at an end. Where there is pending before the judge a criminal charge, however, and where the due process guarantee is arguably involved, the inquiry must go further.

*Id.* at 431–32, 462 A.2d 1230.

██ The bargain between the State and appellant included a postponement of the trial date, an occurrence which required the action of the trial court. More important, appellant maintains that the bargain included appellant's waiver of *Hicks.* Under *Hicks* and its progeny, when a trial date is postponed beyond the 180 day period, without a finding of the requisite cause by the administrative judge or his or her designee, dismissal is mandatory *unless* the defendant seeks

or expressly consents to a trial date in violation of the rule. *State v. Parker*, 347 Md. 533, 537–38, 702 A.2d 217 (1995); *Goins*, 293 Md. at 107–08, 442 A.2d 550; *Franklin*, 114 Md.App. at 534, 691 A.2d 257. If the consent is part of an agreement which later is breached by the State, the consent may not be valid. Accordingly, assuming that the agreement did include a waiver of *Hicks*, there is a clearly established jurisdictional predicate for judicial review of the agreement and enforcement, if appropriate. *See Butler*, 55 Md.App. at 430, 462 A.2d 1230.

 We conclude from the above that the trial court did have the power to dismiss the criminal charges, but we hold that it did not abuse its discretion in refusing to do so. Given that this is a miscellaneous agreement but the type in which the trial court had an interest, and over which the trial court clearly did have jurisdiction, we believe that the test for reviewing the agreement is that test generally applicable to the review of plea agreements. More particularly, the test is whether, in the interests of fair play and equity, the agreement should be specifically enforced. *See Poole*, 321 Md. at 496, 583 A.2d 265; *Brockman*, 277 Md. at 697, 357 A.2d 376; *Courtney*, 98 Md.App. at 659, 635 A.2d 8. *See also Thompson*, 48 Md.App. at 220, 426 A.2d 14 (applying test to agreement that did not include plea). Given the differences between this agreement and true plea agreements, however, we will not presume that fairness and equity mandate specific performance when, as in the instant case, the defendant has substantially performed his obligations. Instead, we will examine the totality of the circumstances to determine whether the trial court properly engaged in a balancing of the equities.

The record reveals that the trial court did properly balance the equities in this case. It found that, regardless of appellant's waiver of *Hicks*, the trial date likely would have been postponed for reasons given by the court at the March 14 and April 25 hearings. It further found that the delay from March 14th to May 5th was not of such a nature that there was a detriment to appellant by virtue of the mere fact of delay.

Finally, it found that the postponement, in fact, benefitted appellant by making available to appellant the exculpatory DNA evidence. The record amply supports these findings and the trial court's refusal to dismiss the charges.

We further agree with the State that appellant, in fact, gave up nothing when he waived *Hicks*. As is more fully discussed later in this opinion, the *Hicks* waiver was unnecessary in light of the fact that there was a good cause determination supporting postponement of the trial.[3] In addition, appellant learned of the State's breach on April 11, prior to the April 28 *Hicks* date, and opposed the State's motion to reschedule the trial within the *Hicks* deadline.

A postponement of a criminal trial meets the requirements of Article 27, § 591 and Rule 4–271 if it satisfies three conditions: (1) a party or the trial court requests the postponement; (2) good cause is shown by the moving party; and (3) the county administrative judge, or a judge designated by him or her, approves of the extension of the trial date. *Franklin*, 114 Md.App. at 534–35, 691 A.2d 257 (1997); *State v. Robertson*, 72 Md.App. 342, 346, 529 A.2d 847 (1987). In addition, a good cause determination must be made by the administrative judge or designee within the 180 day period. *Franklin*, 114 Md.App. at 537–38, 691 A.2d 257 (discussing *Calhoun v. State*, 299 Md. 1, 6–9, 472 A.2d 436 (1984)). A good cause determination cannot be made for the first time, after expiration of the 180 days, by a trial judge ruling on a motion for dismissal or by an appellate court. *Id.*

Appellant's principal argument below, regarding *Hicks*, was that Judge Gelfman did not make a good cause determination until the April 25 hearing, and that she was not the administrative judge's designee on that date. Appellant's argument is

---

**3.** Appellant's motion below was two-fold. It was premised both on a violation of *Hicks* and a violation of the agreement between the parties. Presumably recognizing that the alleged *Hicks* violation is not immediately appealable, appellant has limited his argument on this appeal to the enforceability of the agreement. The merits of the *Hicks* issue, however, directly impact the issue of whether the agreement should be enforced. Accordingly, we will address *Hicks* herein.

not compelling. The trial court expressly found, based upon Judge Gelfman's unrebutted testimony, that she was the administrative judge's designee on March 14, the date she originally postponed the case. Although Judge Gelfman did direct appellant to place his waiver upon the record, she clearly had good cause at the March 14 hearing to postpone the trial date. Judge Gelfman raised the issue of postponement as follows:

I'll tell you what I was thinking. I'll tell you aloud so you know. What I was getting at is you mentioned that there's only ten days until trial in this. I don't know how voluminous—I mean, I'm accustomed to reviewing Ms. Keene's reports. I've done it for years in camera, so—and I'm used to reading, you know, reports that are literally three, four inches thick which takes a while. If I had nothing else to do, that's one thing, but when you have other cases assigned to you and you need to do this within a very short time period, I'm just wondering the best way, the most efficient way, the quickest way to review information and get you the Court's decision and still give you time to review any evidence if in fact the Court orders that it be disclosed.

Although Judge Gelfman did not, at the March 14 hearing, expressly base the postponement upon a good cause determination, she clarified at the April 25 hearing that good cause to postpone the trial did exist on March 14: "Defendant did in fact waive *Hicks* but it wouldn't have been a problem anyway in my opinion because there was sufficient good cause to have the trial date on May 5." Judge Gelfman's good cause determination on April 25 did not run afoul of the principles set forth in *Franklin* and *Calhoun* because it was made within the 180 day period. Further, as the properly designated judge who granted the postponement in the first instance, Judge Gelfman did not have to be redesignated to make a good cause determination on April 25.

This case is factually distinguishable from *Franklin* wherein the original trial date was scheduled outside the 180 day period by the trial court assignment office. It also is distinguishable from *Calhoun* wherein the postponement was

granted by a judge without the authority to grant the post-ponement, and the administrative judge sought to ratify the postponement after the expiration of the 180 days. In this case, the judge had the authority to grant the postponement when she did, and she made a good cause determination within the 180 day period.

█ JUDGMENT AFFIRMED; CASE REMANDED FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY HOWARD COUNTY.[4]

---

4. Although the State is the prevailing party, we view the State's breach of the agreement as having necessitated this appeal to begin with. Accordingly, pursuant to the discretion afforded to us by Rule 8–607(a), we are allocating the costs to Howard County.