832 A.2d 267

**Charles Lee PITT**

v.

**STATE of Maryland.**

**No. 1264, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Sept. 23, 2003.

444

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Argued before DAVIS, KRAUSER and BARBERA, JJ.

DAVIS, J.

On May 8 and 9, 2002, appellant Charles Lee Pitt was tried by a jury in the Circuit Court for Harford County and was convicted of first degree burglary, theft over $500, and malicious destruction of property. Subsequently, on July 9, 2002, appellant was sentenced to a twenty-year term of imprisonment for first degree burglary and a concurrent sixty-day term for destruction of property. The count for theft over $500 merged into the count for first degree burglary.

Appellant noted his timely appeal on July 15, 2002, presenting four questions, which we restate as follows:

I.  Did the trial court err by denying the motion to suppress appellant's statements to the police?

II. Did the trial court err by admitting into evidence State's Exhibit Number Five?

III. Is the evidence insufficient to sustain the conviction for theft over $500?

IV. Did the trial court err by ordering appellant to pay $400,000 in restitution?

We answer question I in the affirmative, and questions II, III, and IV in the negative. Although we shall reverse the judgment of the trial court, we nonetheless address issues II through IV for the guidance of the lower court on remand.

## FACTUAL BACKGROUND

In September 2001, Rosalie Rawle owned a house at 2708 Franklinville Road in Joppa. While vacationing in Florida, she received a telephone call from her neighbor, David Winni.[1] Winni informed Ms. Rawle that, on September 3, 2001, he discovered that someone had broken into her house. Ms. Rawle returned to her house and discovered that some of her property was missing, including jewelry and a checkbook for an account that she owned jointly with her son, James Rawle.

James Rawle and his wife, Renata Ramsburg–Rawle, also discovered that some of their property had been stolen. The couple operated an antique business that sold jewelry and, in the early part of the summer 2001, Rawle and his wife had put some of the jewelry in a basement closet in Ms. Rawle's house. Rawle testified that the jewelry, receipts and records for the jewelry, a handgun, and a shotgun collection were missing after the burglary.

On September 19, 2001, Trooper John Wilson executed a search and seizure warrant at 3912 Red Deer Circle in Randallstown. Appellant was located in a bedroom inside the residence. Because there was an arrest warrant on file for appellant prior to the execution of the search warrant, Trooper Wilson arrested appellant.

Trooper Gary Kulik transported appellant to the State Police Barracks in Bel Air. According to Trooper Kulik's

---

1. Winni lived next door to Rawle's Joppa home and watched her house when she was out of town.

testimony, while in route to the barracks, appellant stated that he had "knowledge or information that [ ] the investigators would be interested in and that he was interested in speaking to ... someone from the State Police in regard to relaying that information to us." Trooper Kulik further testified that, in return for this information, appellant "wanted reassurance that he could get some type of deal or some type of better sentence." Rather than respond directly, Trooper Kulik encouraged appellant to "hold off on [the] information" and told him that his request for a "deal" would be relayed to the lead investigator, Trooper Wilson. Moreover, Trooper Kulik testified he advised appellant that a representative from the Harford County State's Attorney's Office would have to be involved in any type of agreement. Accordingly, when Trooper Kulik arrived at the barracks, he informed Trooper Wilson that appellant had indicated that he wanted "some kind of deal worked out" before he would cooperate.

Upon his arrival at the Bel Air Barracks, appellant was temporarily placed in a cell and then moved to a polygraph room where the officers conduct interviews. Trooper Wilson testified that he read a *Miranda*[2] form to appellant and that appellant placed his initials next to each *Miranda* warning, indicating that he understood them, and then signed his name at the bottom of the page. Next, Trooper Wilson advised appellant that a significant amount of property, including jewelry, was missing. Appellant once again stated that he had information concerning the burglary and the property, but he wanted a written agreement regarding the information he would provide. Consequently, an agreement was drafted and, after re-administering the *Miranda* warnings, Trooper Wilson read the agreement to appellant and both parties signed the agreement.

After appellant signed the agreement, Troopers Kulik and Wilson began questioning appellant about the Franklinville Road burglary. They informed appellant that they had recov-

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ered a cellular telephone at 3912 Red Deer Circle that was purchased from Office Depot using one of the checks stolen in the burglary. The cellular telephone had been activated in appellant's name. Appellant told them that an acquaintance, Jerome Bagley, purchased the cellular telephone. According to appellant, Bagley wrote a check to pay for the cellular telephone and then gave appellant the telephone. Appellant's description of Bagley matched an Office Depot employee's description of the cellular telephone purchaser.

Additionally, appellant informed the officers that Bagley still had the checkbook of one of the burglary victims in his possession and was keeping it in Bagley's 1999 Chevrolet Malibu. Appellant then reviewed a list of jewelry that had been stolen in the burglary and, after reviewing the list, stated that Bagley had a gold watch hanging from the rear view mirror of his Malibu.

Appellant further informed the officers that he was with Bagley a second time in Office Depot and, on that occasion, Bagley bought more items with another check from the victims. According to appellant, the items were in the basement of Bagley's residence. Appellant also stated that he had traveled with Bagley to Anne Arundel County and, while there, Bagley took jewelry to pawn at a pawnshop. Appellant, however, denied knowing from where the jewelry had come and, although he admitted that he performed burglaries in the past, he denied having knowledge of who had committed this burglary.

Subsequently, appellant accompanied Troopers Kulik and Wilson to 1617 North Port Street in Baltimore City—where Bagley's vehicle was located. Trooper Wilson approached Bagley's vehicle and drew a sketch of the watch that appellant had described. Appellant then identified Bagley's residence for the officers. The officers showed the sketch to the victims and they identified the watch as one of their stolen possessions. Shortly thereafter, Trooper Wilson obtained an arrest warrant for Bagley and a search warrant for Bagley's vehicle and house.

On September 19, 2001, the search warrant was executed and Bagley was arrested and questioned by Trooper Wilson. According to Trooper Wilson's testimony, "from the information I got from Mr. Bagley it appeared that [appellant] may not have told us everything as he was required to do by the agreement. He may have knowledge concerning where the property was and additional information concerning the burglary...." Thus, the next afternoon, Trooper Wilson and Trooper Jody Ressin went to the Detention Center to talk to appellant.

Trooper Wilson testified:

I told [appellant] that we don't think he had been completely truthful with us the day before and that I felt that he hadn't completely disclosed the knowledge he had of this case as required by his contract and that we were going to request he submit to a polygraph test as required by his contract.

According to Trooper Wilson, appellant immediately responded that "he hadn't told us everything" and "he went on to say that he had committed the burglary of the [Rawle's] residence along with an accomplice." Appellant continued, stating that the victims had overstated the jewelry that was stolen, that a gun taken in the burglary had been sold in Aberdeen or Edgewood, that "he wanted to keep his earlier deal [the officers] had made with him," and that "he knew more information, but he was going to hold back and he wanted us to honor this deal...." Trooper Wilson informed appellant that he would relay the information to Michael Sanger, the Assistant State's Attorney who had signed the plea agreement.

Thereafter, Trooper Wilson telephoned Sanger and was later informed that Sanger considered appellant's contract "null and void due to him not completely disclosing the information." Sanger further stated that he wished to schedule a polygraph and told Trooper Wilson to inform appellant that the agreement had been terminated.

Appellant's statements from September 19 and 20 were admitted at trial and the jury ultimately found him guilty of

first degree burglary, theft over $500, and malicious destruction of property. This appeal followed.

## DISCUSSION

### I

Appellant first contends that the trial court erred by denying his motion to suppress his statements to the police. According to appellant, the statements that he made on September 19 and 20, 2001 are the product of an inducement and, therefore, are involuntary. Relying upon *Wright v. State*, 307 Md. 552, 515 A.2d 1157 (1986), and *Allgood v. State*, 309 Md. 58, 522 A.2d 917 (1987), appellant avers that, because the State rescinded the plea agreement, his statements are inadmissible *per se* in the State's case-in-chief. Appellant also asserts that the September 20, 2001 statement "was made without [the] benefit of *Miranda* warnings." The State contends that appellant's statements are admissible because he breached the plea agreement.

▆▆▆ In reviewing the denial of a motion to suppress, this Court will look exclusively to the record of the suppression hearing. *Jackson v. State*, 141 Md.App. 175, 187, 784 A.2d 670 (2001). We extend great deference to the suppression hearing judge's findings of fact and determinations of credibility, accepting the court's factual findings unless they are clearly erroneous. *Facon v. State*, 144 Md.App. 1, 19–20, 796 A.2d 101 (2002), *rev'd on other grounds*, 375 Md. 435, 825 A.2d 1096 (2003). Although we review the evidence in the light most favorable to the State, this Court must make its own independent constitutional determination as to the admissibility of the confession, by examining the law and applying it to the facts of the case. *White v. State*, 374 Md. 232, 249, 821 A.2d 459 (2003).

In *Wright*, co-defendant Coley entered a plea agreement, promising to give a full statement and to testify before the grand jury and at trial in return for the State's promise to accept a plea of guilty to second degree murder. The plea

agreement additionally provided that, if Coley broke his promise, the State could use his statements against him at trial. Coley testified before the grand jury. *Wright*, 307 Md. at 579, 515 A.2d 1157.

Thereafter, Coley elected to stand trial pursuant to a not guilty plea and moved to suppress all of his statements on grounds of involuntariness, thereby reneging on his part of the plea agreement. *Id.* He argued that his confession was induced by the State's promise to drop the first degree murder charge and accept a plea to second degree murder. The suppression hearing judge denied Coley's motion and, at trial, Coley's plea agreement, confession, and grand jury testimony were admitted into evidence despite repeated objections. *Id.*

On appeal, the Court of Appeals briefly discussed Maryland cases in which it had held statements inadmissible due to inducement and, quoting Judge Digges, set forth the inducement rule announced in *Hillard v. State*, 286 Md. 145, 406 A.2d 415 (1979):

> [I]t clearly emerges that under Maryland criminal law, independent of any federal constitutional requirement, if an accused is told, or it is implied, that making an inculpatory statement will be to his [or her] advantage, in that he [or she] will be given help or some special consideration, and he [or she] makes remarks in reliance on that inducement, his [or her] declaration will be considered to have been involuntarily made and therefore inadmissible. In examining the facts of this case with this principle in mind, there can be little doubt that Detective Jones[, who told the defendant that he would "go to bat for him" with the State's Attorney,] *made an improper promise to the defendant in exchange for his statement.*

*Wright*, 307 Md. at 580, 515 A.2d 1157 (quoting *Hillard*, 286 Md. at 153, 406 A.2d 415)(alteration in original). Subsequently, the Court set forth the distinguishing features of Coley's case:

> Here, the inducement by the State took the form of promises under a negotiated plea agreement, made in exchange

for Coley's promises under that agreement. The agreement was sanctioned and regulated by Maryland Rule 4–243.[3] The mutual promises were specifically authorized by Rule 4–243. The State neither rescinded nor breached the agreement. Finally, the agreement specified that if Coley reneged, his inculpatory statements could be used against him at trial. None of the Maryland cases relied upon involved circumstances like these.

*Id.* at 583–85, 515 A.2d 1157.

The Court noted that, in cases such as *Nicholson v. State,* 38 Md. 140 (1873)(holding that detective's insistence that defendant should "let it out before [your co-defendant] squeals, for if you do not, [he] will squeal before you, and you will get the worst of it" qualified as an improper inducement), *Hillard,* and *Stokes v. State,* 289 Md. 155, 423 A.2d 552 (1980)(holding that a promise not to arrest a near relative of the defendant constituted an improper inducement and that the resulting confession was inadmissible), it has taken the position that "a promise or inducement by the State, in order to obtain a confession or causing a confession, was an 'improper' inducement." *Wright,* 307 Md. at 585, 515 A.2d 1157. The

---

**3.** Maryland Rule 4–243 states in pertinent part:

(a) **Conditions for agreement.** (1) Terms. The defendant may enter into an agreement with the State's Attorney for a plea of guilty or *nolo contendere* on any proper condition, including one or more of the following:

(A) That the State's Attorney will amend the charging document to charge a specified offense or add a specified offense, or will file a new charging document;

(B) That the State's Attorney will enter a *nolle prosequi* pursuant to Rule 4–247(a) or move to mark certain charges against the defendant stet on the docket pursuant to Rule 4–248(a);

(C) That the State's Attorney will agree to the entry of a judgment of acquittal on certain charges pending against the defendant;

(D) That the State will not charge the defendant with the commission of certain other offenses;

(E) That the State's Attorney will recommend, not oppose, or make no comment to the court with respect to a particular sentence, disposition, or other judicial action;

(F) That the parties will submit a plea agreement proposing a particular sentence, disposition, or other judicial action to a judge for consideration pursuant to section (c) of this Rule.

Court opined, however, that such a general position is inapplicable to the case at hand because "[i]t would be anomalous ... to hold that the State's actions were 'improper' when they are expressly authorized by law (*i.e.*, Rule 4–243) and when the State neither rescinds nor breaches the plea agreement." *Id.* The *Wright* Court further opined that, "[o]bviously [Rule 4–243] does not contemplate that the defendant's promises be deemed *per se* involuntary, under *Hillard* and other cases, on the ground that they were induced by the State's promises" because the rule provides for judicial inquiry into the voluntariness of the defendant's plea bargain agreement. *Id.*

Addressing Coley's argument that his statement should be deemed inadmissible based upon the public policy of encouraging plea bargaining, the Court asserted:

We agree that it would frustrate the policy encouraging plea bargaining to admit against a defendant offers or statements made during plea bargain negotiations. Here, however, the inculpatory statements were made pursuant to a valid consummated agreement in accordance with a rule of this Court, where the agreement provided for the admission of such statements if the defendant breached the agreement. We also agree that defendants would be reluctant to enter plea bargaining agreements if the State could thereafter rescind or breach the agreements, and then use at trail [sic] the defendant's inculpatory statement made as part of the agreement or pursuant thereto. Here, however, the State neither rescinded nor breached the agreement.

. . .

In the situation now before us, we do not believe that it would foster the policy favoring plea bargain agreements to hold Coley's statements inadmissible. On the contrary, it would likely have the opposite result, encouraging defendants to rescind consummated plea bargain agreements without justification.

*Id.* at 586–87, 515 A.2d 1157. Accordingly, the Court held that Coley's statements were admissible.

One year later, in *Allgood,* the Court of Appeals refused to extend the *Wright* holding to a case in which the State rescinded a plea agreement and then sought to use the defendant's statements at trial. *Allgood v. State,* 309 Md. 58, 82, 522 A.2d 917 (1987). Allgood was arrested and charged with the first degree murder of Marion Harris, robbery with a deadly weapon, and related offenses. *Id.* at 60, 522 A.2d 917. The Assistant State's Attorney for Baltimore City, Warren Brown, believed that Michael Walker was also involved in the crimes. Consequently, Brown entered into plea negotiations with Allgood and the parties eventually reached an agreement. The agreement provided that Allgood would testify truthfully before a grand jury about Harris's murder and reveal to the State's Attorney's Office "the truth concerning the murder of [ ] Harris leaving nothing out that he reasonably should remember." In return, the State would proceed against Allgood only on the manslaughter charge. *Id.* at 60–61, 522 A.2d 917.

Pursuant to the agreement, Allgood supplied a statement to Brown and testified before the grand jury. *Id.* at 61, 522 A.2d 917. The State became suspicious that Allgood was not telling the truth and requested that Allgood take a polygraph test and, when Allgood subsequently failed the test, the State withdrew from the agreement. *Id.* at 64, 522 A.2d 917. Moreover, the State used Allgood's statements against him at trial, invoking *Wright* as legal authority. Allgood appealed.

In an unreported opinion, we upheld the trial court's admission of Allgood's grand jury testimony into evidence at the trial on the merits. Relying upon *Ball v. State,* 57 Md.App. 338, 470 A.2d 361 (1984), we held that Allgood's grand jury testimony was voluntary and admissible because he "had been warned, prior to testifying before the grand jury, that he was not required to incriminate himself and that his testimony could be used against him if he subsequently went to trial on the pending charges." *Allgood,* 309 Md. at 74–75, 522 A.2d 917.

Refusing to extend the *Wright* exception to the *Allgood* fact pattern, the Court of Appeals remanded the case to this Court with instructions that it overturn Allgood's conviction. *Id.* at 82, 522 A.2d 917. First, the Court upheld the trial court's finding that, by failing the polygraph examination, Allgood was not entitled to the enforcement of the plea agreement. *Id.* at 71, 522 A.2d 917. The Court then distinguished the facts in *Wright* from those in the case at hand:

The decisive difference between Coley's situation and that of Allgood is that the defendant reneged on the agreement in the former but the State terminated the agreement in the latter. In Coley's case, "the State neither rescinded nor breached the agreement." In Allgood's case the State flatly rescinded the agreement in a letter to defense counsel, and thereafter refused to submit it to the court. It proceeded to try Allgood on the murder and robbery charges despite his desire to plead pursuant to the agreement. Furthermore, the Coley agreement "specified that if Coley reneged, his inculpatory statements could be used against him at trial." The agreement with Allgood contained no such provision. Allgood answered "Yes" when he appeared before the Grand Jury to the question if he understood that "anything you say here can be used against you in a court of law." But this is far from an agreement that his statements could be used against him at trial.

*Id.* at 77, 522 A.2d 917 (citations omitted).

The Court succinctly summarized the teachings of *Wright:*

1) When statements are obtained from a defendant upon promises made him by the State by way of a plea bargain agreement, the statements, in the light of Rule 4–243, are not inadmissible *per se,* under the inducement doctrine, in the State's case[-]in[-]chief at trial on the merits.

2) When the State rescinds, repudiates, or breaches the plea bargain agreement, for whatever reason, after the statements are so obtained, the statements, as a matter of

law, are inadmissible *per se* in the State's case[-] in[-]chief at trial on the merits.

*Id.* at 78, 522 A.2d 917.

Furthermore, the *Allgood* Court held:

The reason for the State's repudiation of the agreement is immaterial with respect to the admissibility of the statement. *Whether its reason be sound or unsound, technical or substantial, in good faith or simply because the prosecutor had misgivings or a change of heart, or was utterly arbitrary, is of no matter.* The justification *vel non* of the rescission, repudiation, or breach of the agreement by the State goes to whether the defendant is entitled to have the agreement enforced; *it does not affect the admissibility of the statement obtained under it.*

*Id.* at 79, 522 A.2d 917 (emphasis added). Accordingly, despite the fact that Allgood breached the plea bargain agreement, the Court held that Allgood's statements should not have been admitted at trial because the State was the party responsible for rescinding the agreement.

In the case *sub judice,* appellant signed a plea agreement in which he agreed to "fully and truthfully disclose to the State any and all knowledge and information he may have concerning the investigation." In return, the State agreed that, after appellant extended his full and truthful cooperation, it would schedule a bond review hearing and recommend personal recognizance and, that at a later date, all charges against appellant arising from the investigation would be *nolle prossed.* The agreement explicitly stated that appellant's breach of the agreement by knowingly withholding evidence from the State or not being completely truthful would permit the State to "prosecute him for any offenses in which the State agreed not to prosecute in exchange for cooperation by [appellant] with the investigation" and "use against him in all prosecutions the information and documents that he has disclosed to the State during the course of his cooperation."

*Voluntariness*

■ Although the plea bargain in the case *sub judice* ineluctably induced the statements obtained, its mere existence makes the inducement proper. *Allgood,* 309 Md. at 78, 522 A.2d 917. In the absence of a plea bargain, appellant's statements to the officers on September 19 and 20, 2001 would have unquestionably failed the two-part test for voluntariness set forth in *Winder v. State,* 362 Md. 275, 309, 765 A.2d 97 (2001), which deems statements involuntary if:

1) a police officer or an agent of the police force promises or implies to a suspect that he or she will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and 2) the suspect makes a confession in apparent reliance on the police officer's statement.

■ However, a plea bargain confers a voluntary status upon such induced statements, albeit temporary under certain circumstances. For instance, the State in the instant case induced appellant's statements by promising him that it would recommend his release on his personal recognizance and that it would *nolle prosse* all charges against him. Yet, when the State rescinded the plea agreement, statements obtained under it immediately lost their voluntary status and became inadmissible at trial.

We discussed the interaction between waiver given in reliance upon a promise made by the prosecution and the breach thereof in *Jackson v. State,* 120 Md.App. 113, 135, 706 A.2d 156 (1998):

Finally, the entry of a plea is a waiver of a criminal defendant's Fifth Amendment right against self-incrimination and Sixth Amendment right to trial by jury. Thus, where the waiver rests upon a promise that is breached by the State, the defendant's constitutional rights are violated.

(Citations omitted.)

Accordingly, although the State received credible information leading it to believe that appellant was being untruthful and that his untruthfulness constituted a breach of the agree-

ment, by rescinding the plea bargain, the State gave up all rights to use appellant's statements at trial. Regardless of whether appellant breached the agreement and regardless of whether the State was indeed justified in rescinding the agreement, all statements obtained under the plea agreement are inadmissible *per se* simply because the State—and not appellant—rescinded the agreement. When appellant made the inculpatory statements on September 19 and 20, 2001, he was under the impression that his statements were protected by the plea agreement. Accordingly, statements made both days are protected and inadmissible at trial.[4]

■ Our holding is not altered by the provision in the plea agreement permitting the State's Attorney to use any statements by appellant if appellant breached the agreement. The law is clear that, when the State rescinds a plea agreement for whatever reason, statements induced by it are inadmissible *per se*. Thus, the provision does not impact our holding.

### *Public Policy*

In discussing the derivation of Maryland Rule 5–410(a) and the policy considerations of the Court of Appeals in its decision in *Wright*, this Court—in the only decision uncovered by our research not discussed herein—explained in *Elmer v. State,* 119 Md.App. 205, 213–14, 704 A.2d 511 (1998):

This rule was·derived from Federal Rule of Evidence 410 and adopted by the Court of Appeals in 1993. Years prior to the adoption of the rule, the Court of Appeals expressed its agreement with the principle that statements made in the course of unsuccessful plea bargaining should not be introduced against a defendant at a later trial. *Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986). The *Wright* Court reasoned that such a rule would (1) *facilitate the policy of encouraging plea bargaining and (2) effectuate the defen-*

---

4. We, therefore, need not address the *Miranda* issue regarding the statements obtained on September 20, 2001.

*dant's right subsequently to withdraw [from] a guilty plea.*
[*Id.*] at 586–87, 515 A.2d 1157.

(Emphasis added.)

In a footnote, however, as mentioned, *supra,* we observed: Interestingly, applying these principles to the facts of *Wright,* the Court declined to suppress the defendant's statements. Wright had breached a plea agreement in which he had specifically agreed to the use of his statements in case of his breach. The Court reasoned, therefore, that effective plea bargaining would best be encouraged by holding Wright to his agreement and admitting his statements. 307 Md. at 586–87, 515 A.2d 1157.

Rule 5–410(a)(4) affords appellant no relief because, as the State has correctly pointed out, the rule only bars the introduction of evidence and no evidence was introduced in the instant case regarding any plea bargaining statement. The prosecutor merely asked whether an inconsistent statement had been made, and Brown responded with a firm denial. No attempt was made to prove the hypothetical statement. The judge, therefore, did not commit error with regard to appellant under Rule 5–410 by allowing the question of Brown.

*Id.* at 213–14, n. 2, 704 A.2d 511.

In *Elmer,* unlike the case at bar, no statement elicited during the process of plea bargaining was admitted against the defendant. In addressing appellant's arguments based on public policy, we concluded, in *Elmer:*

Appellant also asks us to reverse out of concern for the public policies behind the inadmissibility of statements made in plea negotiations, because the prosecutor was obviously cross-examining Brown based on information the prosecutor learned during Brown's plea negotiations. Appellant's argument for extending the effect of the rule calls upon this Court to reach two separate conclusions: (1) that it violated the policies of Rule 5–410(a)(4) for the prosecutor to use the statement made in plea discussions as the basis for cross-examination on a prior inconsistent statement, and (2) that

it furthers these policies to extend the protection of the rule to appellant, who was not a party to the negotiations at issue. In considering these two requested extensions, we notice that we do not have the benefit of a single reported Maryland case interpreting the scope of Rule 5-410, nor one delineating the extent of the specific policies first identified in *Wright.* We ascribe this lack of precedent to the relative clarity and simplicity of the rule, as well as to the high integrity of the prosecutorial bar in general. The Reporter's Note to Rule 5-410 does not provide us with any guidance with regard to appellant's argument either.

*Id.* at 214-15, 704 A.2d 511 (footnote omitted).

The *Elmer* Court finally concluded:

At this juncture we decline appellant's first invitation to hold that the prosecutor's question violated the spirit of the rule. First, we note that it is still an open question whether Maryland's Rule 5-410 bars the State from introducing actual evidence of a prior statement made during plea negotiations once the defendant has taken the stand and testified in an inconsistent manner, although we are aware that the analogous federal rule has been so construed, and the structure of the Maryland rule supports such a reading.

*Id.* at 215, 704 A.2d 511 (footnote omitted).

Patently, *Elmer* is inapposite because we are not presented, in the case at hand, with the introduction of evidence of statements inconsistent with a defendant's trial testimony but, rather, with evidence of appellant's statements made during plea negotiations introduced in the State's case-in-chief. Moreover, appellant elected not to testify or present evidence in his behalf. Citing *Wright,* however, *Elmer* reiterates the policy consideration that a defendant is more likely to engage in plea bargaining and cooperate with an investigation if a defendant, aided by his or her counsel, did not have to be guarded in providing information which might later be used against him or her were he or she to be subsequently prosecuted for the offense under investigation. Regarding the role of plea bargaining in reducing burgeoning caseloads, we ob-

served in *Jackson*, quoting *Butler v. State*, 55 Md.App. 409, 425–26, 462 A.2d 1230 (1983):

In yet another significant regard, the plea bargain contrasts with other miscellaneous bargains. The interest of the courts in the plea bargaining process is based not so much on the equitable notion that every suspect citizen be treated fairly by the elected prosecutor but rather on the credibility of the plea bargaining process and the indispensable role that that process plays in the management of an otherwise overwhelming caseload.

. . .

First, as we just noted, plea bargains serve an indispensable role in our criminal justice system by disposing of a large percentage of our criminal cases. [*State v.*] *Parker*, 334 Md. [576,] 597–98, 640 A.2d 1104 [1994]; *Allgood v. State*, 309 Md. 58, 66, 522 A.2d 917 (1987); [*State v.*] *Brockman*, 277 Md. [687,] 692–93, 357 A.2d 376 [(1976)]. The agreement at issue, while serving the convenience of the prosecutor in this particular case, is not a type of agreement that serves a similar systemic purpose.

*Jackson*, 120 Md.App. at 133–35, 706 A.2d 156.

The uncompromising language of the Court of Appeals, in *Allgood*, that "the reason for the State's repudiation of the agreement is immaterial with respect to the admission of the statement ... [w]hether its reason be sound or unsound, technical or substantial, in good faith or simply because the prosecutor had misgivings or a change of heart, or was utterly arbitrary" is clearly grounded in the public policy role of the Court. As such, the unequivocal pronouncement of a consequential policy issue is to be accorded great deference until or unless abandoned or modified by the Court or legislative enactment. As we observed in *Owens Corning v. Bauman*, 125 Md.App. 454, 496, 726 A.2d 745 (1999):

Alternatively, matters of policy in the judicial arena are relegated to Maryland's highest court—the Court of Appeals. As we have noted, the Court of Appeals has been presented with several opportunities to revisit its decision

construing "arises" in *Armstrong II* and has declined to do so. The manner in which to determine the point in time the statutory cap applies was spelled out in clear and unmistakable terms in 1992 in *Armstrong II*. Until and unless either avenue of redress available to appellant and amicus Maryland Defense Counsel is pursued, *it is not within our purview to usurp the legislative function of the General Assembly or to overrule a decision of the Court of Appeals.* (Emphasis added.)

Thus, our holding in the case *sub judice* is supported by the public policy of encouraging defendants to enter plea bargains. The practice of plea bargaining speeds up the administering of justice. To permit the State to enter into a plea agreement with appellant, induce inculpatory statements under the agreement, later rescind the agreement, and ultimately use the statements at trial against the defendant would have a chilling effect on a defendant's willingness to enter plea bargains. Appellant's statements, in our view, should not have been admitted at trial.

## II

Appellant next contends that the trial court erred by admitting State's Exhibit Number Five (Exhibit Five), which consists of a written list of items, compiled by Rawle and his wife, that were taken at the time of the burglary. According to appellant, the list of missing property constituted inadmissible hearsay. The State responds that appellant failed to preserve this argument for appeal and, regardless, it is meritless.

When a party specifies particular grounds for an objection, it is deemed to have waived all other grounds not mentioned. *Bell v. State,* 118 Md.App. 64, 93–94, 701 A.2d 1183 (1997), *rev'd on other grounds,* 351 Md. 709, 720 A.2d 311 (1998). At trial, when the State offered the list of missing property as Exhibit Five, appellant objected as follows:

Your Honor, I must—my first problem is that him [sic] and his wife prepared the list. I don't know what extent he

prepared, his wife prepared. I have a problem with the list compiled by two people, only one has testified.

Also, the list contained values, he said something speculative. Exactly what the value is is speculative. I can't cross-examine his wife with regard to the value she put on the items, she has not testified. So I object to this coming in, at this point.

Appellant asserts that,

> [a]lthough defense counsel did not use the words "hearsay" or "confrontation," it is clear from his comments that the bases for his objection were that [Exhibit Five] is hearsay and that its admission denied his right of confrontation as guaranteed by the Sixth Amendment to the U.S. Constitution and Article 21 of the Md. Declaration of Rights.

We agree with appellant that, although counsel did not specifically use the word "hearsay" in his objection, the substance of his objection is sufficient to preserve the issue for our review.

Maryland Rule 5–801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement" refers to "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Rule 5–801(a). Generally, hearsay is inadmissible, unless the statements fall within a recognized exception to the rule excluding hearsay. *Kapiloff v. Locke,* 276 Md. 466, 471, 348 A.2d 697 (1975).

The writing at issue is clearly inadmissible hearsay. Rawle testified that "[m]y wife and I compiled the list," that they did so from "[r]eceipts we had" and "[r]ecollection of what was in the box because my wife had worked with the material," and that some of the items were from his wife's personal collection. Thus, the writing is offered to prove the truth of the matter asserted, namely that the listed items were stolen and had the values indicated in the writing. The document was a joint product of both Rawle and his wife, containing opinions and conclusions of both individuals; however, only Rawle was available for cross-examination. Both

parties must be available to testify in order for the document to be admitted into evidence.

Nonetheless, "the erroneous admission of evidence will not justify reversal unless the complaining party can show that the admission was prejudicial to him [or her]." *Kapiloff,* 276 Md. at 472, 348 A.2d 697. According to the State, "there was no unfair prejudice to the defense ... [because] even without [Exhibit Five], there was no question but that the value of the property far exceeded the $500 required to establish felony theft."

An owner of goods is presumptively qualified to provide testimony regarding the value of his goods. *Cofflin v. State,* 230 Md. 139, 142, 186 A.2d 216 (1962); *Christian v. State,* 65 Md.App. 303, 308, 500 A.2d 341 (1985); *Wallace v. State,* 63 Md.App. 399, 410–11, 492 A.2d 970 (1985). Although the test for the value of stolen goods is market value, "proof of market value 'may be indirect as well as direct.' " *Wallace,* 63 Md.App. at 410, 492 A.2d 970 (quoting *Vucci v. State,* 13 Md.App. 694, 701, 284 A.2d 646 (1971)).

In *Wallace,* we held that the owner's recollection of "the respective purchase prices, including installation costs, of the items stolen from the vacant apartment" was "circumstantially relevant to present market value." *Id.* Thus, although no direct evidence of market value was presented valuing the stolen items in excess of $300, we concluded that such direct evidence was unnecessary because "the court could draw a fair inference, from evidence of the original purchase prices, that the items were worth more than $300[ ]." *Id.* at 411, 492 A.2d 970.

On cross-examination in the case *sub judice,* Rawle testified that he was familiar with the description of a rare Egyptian necklace and recalled paying "about $10,000" for it. Moreover, in response to appellant's questions, Rawle described a two-carat loose diamond that was stolen as amethyst and "[v]ery slightly included." He recalled paying approximately $7,000 for the diamond. Consequently, as an owner of the property, his testimony was sufficient to permit the court to

draw an inference that the stolen goods were worth more than the statutory requirement of $500, thereby rendering harmless any error committed by the introduction of Exhibit Five into evidence.

## III

■ Appellant next contends that the evidence was insufficient to sustain his conviction for theft over $500. Specifically, appellant avers that, although count two charges theft of jewelry jointly owned by Ms. Rawle and her son, "[t]he only property taken that was shown to be jointly owned by [Ms. Rawle and her son] is the checkbook that was admitted as State's Exhibit [Number Four]." Asserting that both Ms. Rawle and her son were "owners" of the property for the purposes of Maryland's theft provisions, the State argues that, even if they were not joint "owners," the single larceny doctrine states that thefts from multiple owners on a single occasion constitute a single theft.

■ When reviewing the sufficiency of the evidence, our task is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Taylor v. State*, 346 Md. 452, 457, 697 A.2d 462 (1997)(quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We do not measure the weight of the evidence or judge the credibility of the witnesses, as that is the responsibility of the trier of fact. *Dawson v. State*, 329 Md. 275, 281, 619 A.2d 111 (1993); *see Bryant v. State*, 142 Md.App. 604, 622, 791 A.2d 161 (2002). Instead, although we do not re-weigh the evidence, "we do determine whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *Bryant,* 142 Md.App. at 622–23, 791 A.2d 161 (quoting *White v. State*, 363 Md. 150, 162, 767 A.2d 855 (2001)).

At the conclusion of the State's case-in-chief, appellant's counsel moved for judgment of acquittal as to count two and the following ensued:

> [APPELLANT'S COUNSEL]: With regard to the theft count. The indictment reads ... Property of Rosalie Rawle and James Rawle was taken.
>
> Now if the charge—if the charge by the State is of theft of Ms. Rosalie Rawle's property that should be a count in the indictment. If it is the theft of Mr. James Rawle, that should be a count in the indictment. Otherwise it is duplicitous. If there is property owned by both [Ms. Rawle and her son], that is fine, what the indictment charges; but the only evidence of any jointly owned property, property of both those people is the checkbook. The checking account is in both names.
>
> [Ms. Rawle] testified about some rings, most of which are not her things. They don't have to be, under the law. They are in her possession or are hers, that is fine. But [Ms. Rawle] put no value on those rings. The value is based on the property which is owned by [Mr. Rawle] and Ms. Ramsburg, which they testified is business property, partnership property. We know the value of that. There is no allegation that partnership property was charged in this case.
>
> So what we have is no value on the property of [Rawle] and [Ms. Rawle]. No allegation of theft of the partnership property of Ms. Ramsburg. There is no evidence of theft in this case.
>
> THE COURT: Why? Mr. Rawle testified Ms. Ramsburg was his wife [and] it is their joint legal property.
>
> [APPELLANT'S COUNSEL]: Partnership property. It was not alleged that property was stolen.
>
> THE COURT: That is what the indictment says.
>
> [APPELLANT'S COUNSEL]: Indictment says Ms. [Rawle's] property was stolen, [Ms. Rawle and her son.]
>
> . . .

[PROSECUTOR]: As to the value, Your Honor, there is a charge of one theft, one event where he took property. The property happens to belong to a couple of people. The value, there is evidence in as to the value. The list that we put in compiled by [ ] Rawle certainly if you add that up it is substantially over $500.

Generally, the single larceny doctrine arises in three principal contexts:

(1) whether a count in a charging document alleging that the defendant stole the property of several persons at the same time charges more than one offense and is therefore duplicitous; (2) whether a prosecution, conviction, or sentencing for stealing the.property of one person bars, under double jeopardy principles, the prosecution, conviction, or sentencing for having stolen the property of another person at the same time; and (3) *whether, when the property of different persons is stolen at the same time, the values of the separate items of property may be aggregated to raise the grade of the offense or the severity of the punishment, to the extent that either is dependent on the value of the property taken.*

*State v. White,* 348 Md. 179, 182, 702 A.2d 1263 (1997)(emphasis added). Thus, even if no single stolen item is valued at $500 or more, the amounts can be aggregated in order to charge a defendant for theft over $500 as long as the items were stolen in the course of the same incident.

Regardless of the applicability of the single larceny doctrine, we perceive no material variance. In *Burgess v. State,* 89 Md.App. 522, 598 A.2d 830 (1991), we considered whether the trial court committed error by permitting a variance in the proof at trial with respect to the malicious destruction of property count (count ninety). Count ninety alleged that Burgess partially destroyed Scott's car. At trial, however, a passenger in the vehicle indicated that the automobile belonged to Moody, not to Scott. The court denied the State's motion to amend the count to reflect Moody as the vehicle's owner. Subsequently, the State argued that "the change in

the owner's name did not change the character of the offense." *Id.* at 540, 598 A.2d 830. The court ultimately convicted Burgess on count ninety.

On appeal, we held that, because proof of ownership is not a material element of the crime of "Malicious Destruction of Property," "[p]roof that the subject property is that of 'another' is all that is required." *Id.* at 541, 598 A.2d 830. Thus, we opined that no material variance existed because the charging document appropriately alleged that the automobile was the property of "another" and the evidence sufficiently established that the property was that of "another." *Id.*

In the case *sub judice,* Md.Code Ann. art. 27, § 342, in effect at the time of the offense, provided in pertinent part:

(a) *Obtaining or exerting unauthorized control.*—A person commits the offense of theft when he [or she] willfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property of *the owner,* and;

(1) Has the purpose of depriving *the owner* of the property; or

(2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive *the owner* of the property; or

(3) Uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive *the owner* of the property.

(Emphasis added.) Moreover, article 27, § 340(h) provides that, for the purposes of the theft subheading, " '[o]wner' means a person, other than the offender, who has possession of or any other interest in the property involved, even though that interest or possession is unlawful, and without whose consent the offender has no authority to exert control over the property," while "property of another" is defined under § 340(j) as "real or personal property in which a person other than the offender has an interest which the offender does not have authority to defeat or impair...."

Accordingly, similar to *Burgess*, the State in the case *sub judice* need only prove that the property stolen belonged to "another" and was taken from an "owner." The evidence sufficiently proved that Rawle had an interest in the involved property, as a member of the partnership with his wife. Thus, there was no material variance between the allegations and the State's proof.

## IV

Appellant's final contention is that the trial court erred by ordering him to pay $400,000 in restitution. According to appellant, "there is no reliable evidence that the stolen jewelry has a value of $400,000" and the court erroneously failed to base the restitution on fair market value. Appellant also asserts that the court erroneously ordered restitution because it failed to conduct a reasonable inquiry into appellant's ability to pay the restitution. The State responds that we may not address appellant's argument because appellant failed to preserve it. We agree.

Maryland Rule 8–131(a) provides, in pertinent part, that

[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

Consequently, because appellant failed to object and give the trial judge an opportunity to rule upon the restitution issue, we decline to address the merits.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY REVERSED; CASE REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY HARFORD COUNTY.**

Concurring opinion by KRAUSER, J.

I reluctantly concur. I concur because I believe that the conclusion reached by the majority is consistent with current

case law. I do so reluctantly because I believe that the rule applied by the majority to reach that conclusion should be reconsidered. I am referring of course to the rule that when the State rescinds or otherwise terminates a plea agreement, for any reason, any inculpatory statement procured by that agreement is inadmissible. In fact, I write this concurrence in the hope that the Court of Appeals will revisit this rule and discard or at least substantially modify it.

The majority opinion begins with a discussion of Maryland's rule that a confession induced by a promise is inadmissible. This rule of exclusion is one of the most restrictive to be found in any jurisdiction. *Stokes v. State*, 289 Md. 155, 160, 423 A.2d 552 (1980).[1] It excludes any inculpatory statement secured by a promise of a benefit, regardless of whether the promise was empty or meaningful, vague or unambiguous, misleading or straight forward, or proffered in good faith or bad. It is, to borrow a phrase from Wigmore, an "extravagant policy of exclusion." 3 Wigmore, *Evidence* § 837, at 475 n. 1 (Chadbourn rev.1970).

This rule, however, is deeply rooted in Maryland law. It was first articulated one hundred and thirty years ago in *Nicholson v. State*, 38 Md. 140 (1873),[2] and has been consistently re-affirmed. *Winder v. State*, 362 Md. 275, 309, 765 A.2d 97 (2001); *Pappaconstantinou v. State*, 352 Md. 167, 174, 721 A.2d 241 (1998); *Birkenfeld v. State*, 104 Md. 253, 256, 65 A. 1 (1906); *Holmes v. State*, 67 Md.App. 244, 249, 507 A.2d 197 (1986). At the time that the Nicholson rule was promulgated, it was a reflection of a growing consensus, among

---

**1.** In *Stokes*, the Court of Appeals observed, "[t]he principle of Maryland criminal law which excludes an inculpatory statement induced by 'any promise of favor or threat of punishment,' ... is, perhaps, more extensive than those of other jurisdictions." *Stokes*, 289 Md. at 160, 423 A.2d 552 (quoting *Hillard v. State*, 286 Md. 145, 154, 406 A.2d 415 (1979)).

**2.** In *Nicholson*, the Court stated that "if the confession of the appellant had been induced by any threat of harm, or promise of worldly advantage ... it ought to be excluded." *Nicholson*, 38 Md. at 153.

state[3] and federal[4] courts, that promises, which induce a confession, compromise the voluntariness of that confession.

Indeed, eleven years later, in *Hopt v. Utah*, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), the Supreme Court held that a confession induced by a promise was involuntary. And thirteen years after that, it constitutionalized this principle in *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). There, it declared that the admission of a confession induced by "any direct or implied promises, however slight," violated the Fifth Amendment. *Id.* at 542–43, 18 S.Ct. 183. But this of course occurred at a time when an accused had few protections during an interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was sixty-nine years away and the right to counsel did not attach to interrogation sessions and, in any event, could only be exercised by those who could afford one.[5]

Moreover, in the years that followed *Bram*, the Court displayed an unusual reluctance to apply this principle. In *Stein v. New York*, 346 U.S. 156, 186, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), for example, the Court upheld a confession resulting from an agreement struck by Stein and the police. And in two other cases, *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), and *Leyra v. Denno*, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954), it conspicuously avoided the opportunity to reaffirm the principle that promise-induced

3. *See, e.g., Gates v. State*, 14 Ill. 433, 436 (1853); *Redd v. State*, 69 Ala. 255, 259 (1881); *People v. Robertson*, 1 Wheeler's Criminal Law Cases 66, 66–69 (N.Y. City Recorder's Ct. 1822).

4. *See, e.g., United States v. Cooper*, 25 F.Cas. 629, 630 (W.D.Va.1857); *United States v. Pocklington*, 27 F.Cas. 580, 580 (C.C.Dist.Col.1822); *United States v. Pumphreys*, 27 F.Cas. 631, 631 (C.C.Dist.Col.1802).

5. *See Powell v. Alabama*, 287 U.S. 45, 59–60, 53 S.Ct. 55, 77 L.Ed. 158 (1932)(providing indigent defendants with court appointed counsel in capital cases); *Johnson v. Zerbst*, 304 U.S. 458, 463, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)(recognizing the right to appointed counsel in all federal criminal prosecutions); *Gideon v. Wainwright*, 372 U.S. 335, 339–40, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (recognizing the right to appointed counsel in federal cases to all indigent felony defendants.).

confessions were per se inadmissible. In both cases, it held that a confession induced by substantial threats of harm and significant promises of leniency was inadmissible. But, in both instances, it declined to point out that, under *Bram*, either the promises or the threats would have provided a basis for its ruling.

In the meantime, state courts, chafing under the constraints of this rule, found ways around it. Some required, before they would exclude a statement, that the promise be specific and direct, *State v. Brown*, 217 Kan. 595, 538 P.2d 631, 637 (1975); *Hernandez v. State*, 952 S.W.2d 59, 67 (Tex.App.1997), or that it only affect a collateral matter, *State v. Hardee*, 83 N.C. 619, 623–24 (1880); *State v. Tatro*, 50 Vt. 483, 490 (1878), or that it be one that was likely to induce a false confession, *Fisher v. State*, 379 S.W.2d 900, 903 (Tex.Crim.App.1964); *Hardee*, 83 N.C. at 623–24; *Tatro*, 50 Vt. at 490, or that it be shown that it overbore the will of the accused. *Miller v. Fenton*, 796 F.2d 598, 608 (3d Cir.1986). Others simply limited the very definition of a promise. *See Brown v. State*, 545 So.2d 106, 112 (Ala.Crim.App.1988); *Moore v. State*, 493 So.2d 1301, 1303 (Miss.1986).

Ultimately, the Supreme Court formally abandoned the *Bram* rule in *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In the post-*Miranda* world of 1991, the *Fulminante* Court rejected the notion that all promises that induce an inculpatory statement render that statement inadmissible and held that a promise was just one factor to be considered, among many, in a "totality of the circumstances" analysis of a statement's voluntariness. *Id.* But even before this occurred, a new consensus among federal and state courts was emerging; that consensus favored a totality of the circumstances test. *See, e.g., Haynes v. Washington*, 373 U.S. 503, 516–17, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Leyra v. Denno*, 347 U.S. 556, 561, 74 S.Ct. 716, 98 L.Ed. 948 (1954); *Ashdown v. Utah*, 357 U.S. 426, 430–31, 78 S.Ct. 1354, 2 L.Ed.2d 1443 (1958); *People v. Mounts*, 784 P.2d 792, 797 (Colo.1990); *People v. Wright*, 127 Ill.App.3d 747, 82 Ill.Dec. 817, 469 N.E.2d 351, 354 (1984); *Drew v. State*, 503 N.E.2d

**474**

613, 617 (Ind.1987); *State v. Wilson*, 719 S.W.2d 28, 32 (Mo. App.1986); *People v. Montez*, 167 A.D.2d 356, 561 N.Y.S.2d 494, 496 (N.Y.App.Div.1990); *Pontow v. State*, 58 Wis.2d 135, 205 N.W.2d 775, 778 (1973).

The Nicholson rule, however, still prevails in Maryland, notwithstanding the protections now afforded an accused and the incongruities engendered by its application. For example, Maryland law holds that a statement obtained by trickery and deception is not necessarily involuntary, *Winder*, 362 Md. at 305, 765 A.2d 97; *Ball v. State*, 347 Md. 156, 178, 699 A.2d 1170 (1997); *Kier v. State*, 213 Md. 556, 562, 132 A.2d 494 (1957), while a statement obtained by a good-faith promise is. To put a finer point on it, Maryland law presently excludes, as involuntary, a statement made in exchange for a desired benefit while it admits, as voluntary, a statement obtained by trickery for which the accused receives no benefit at all.

No distinction is made in Maryland between proper and improper promises. A bona fide promise to assist a suspect in return for his or her assistance in investigating or prosecuting a crime is treated the same as an empty, misleading, or deceptive promise. All promises are suspect, no matter what benefits they bestow or how earnestly they are sought by the accused. This is unfortunate for the State, the accused, and the administration of justice. It discourages police from offering a benefit and prevents the defendant from receiving one. It needlessly hampers investigation and ultimately suppresses evidence critical to any decision judge or jury must make as to guilt or innocence.

Both the untrustworthiness and the involuntariness of such statements have been cited as justification for this rule. *Winder v. State*, 362 Md. 275, 306, 765 A.2d 97 (2001); *Ball*, 347 Md. at 175, 699 A.2d 1170; *Reynolds v. State*, 327 Md. 494, 505, 610 A.2d 782 (1992); *Hoey v. State*, 311 Md. 473, 483, 536 A.2d 622 (1988); *Wright v. State*, 307 Md. 552, 580, 515 A.2d 1157 (1986); *Hillard v. State*, 286 Md. 145, 151, 406 A.2d 415 (1979). There is of course an important distinction between

the two rationales. A statement can be involuntary but trustworthy or, obversely, untrustworthy but voluntary.

The more compelling rationale, I believe, is the potential untrustworthiness of a promise-induced confession, particularly when promises are really threats. *See, e.g., Winder,* 362 Md. at 294, 765 A.2d 97(where the police promised to protect the defendant from angry citizens if he cooperated, implying that they would otherwise not), or when the promises are combined with threats. *See, e.g., Fulminante,* 499 U.S. at 287–88, 111 S.Ct. 1246, 113 L.Ed.2d 302; *Ball,* 347 Md. at 174, 699 A.2d 1170. But it is difficult to conceive how, standing alone, a good faith promise to bestow a desired benefit that induces a suspect to cooperate with police is necessarily involuntary. "Induce" is a morally neutral word; it does not imply either wrongdoing or deception. To persuade someone to do something, by offering an inducement, does not necessarily affect the voluntariness of what is done. In contract law, we call the inducement—"consideration." It is the basis of contracts, and it does not render a contract involuntary— but, in fact, enforceable.

With the adoption of Maryland Rule 4–243,[6] Maryland drew a bright line between stationhouse promises and plea agree-

---

**6.** Maryland Rule 4–243 states in pertinent part:

(a) Conditions for Agreement.—The defendant may enter into an agreement with the State's Attorney for a plea of guilty or *nolo contendere* on any proper condition, including one or more of the following:

(1) That the State's Attorney will amend the charging document to charge a specified offense or add a specified offense, or will file a new charging document;

(2) That the State's Attorney will enter a *nolle prosequi* pursuant to Rule 4–247(a) or move to mark certain charges against the defendant stet on the docket pursuant to Rule 4–248(a);

(3) That the State's Attorney will agree to the entry of a judgment of acquittal on certain charges pending against the defendant;

(4) That the State will not charge the defendant with the commission of certain other offenses;

(5) That the State's Attorney will recommend, not oppose, or make no comment to the court with respect to a particular sentence, disposition, or other judicial action;

ments, permitting confessions secured by the latter to be admitted into evidence. Unfortunately, the "plea agreement" exception to Maryland's rule excluding all promise-induced confessions has its own broad exception. Statements made pursuant to such a plea agreement are inadmissible if, for any reason, the State rescinds the agreement. *Allgood v. State,* 309 Md. 58, 522 A.2d 917 (1987). That rule applies even where the State rescinds the agreement because the defendant has breached it. The "rescission" test for determining the admissibility of post-plea agreement statements even applies where the defendant has been forewarned that his statements would be used against him if he breached the agreement.

The selection of that single criterion for determining the admissibility of a post-plea agreement statement—particularly, something as arbitrary as the identity of the rescinder—is unfortunate. It means no matter how flagrantly the defendant violates the plea agreement, the State's only recourse is to rescind it and forgo the use of any statement he has given. Even if he grossly misrepresents the extent of his participation in the crime under investigation, as occurred here, potentially committing two crimes in the process of doing so (obstruction of justice [7] and giving a false statement to a police officer [8]), the State cannot introduce the statement in its case-

---

(6) That the parties will submit a plea agreement proposing a particular sentence, disposition, or other judicial action to a judge for consideration pursuant to section (c) of this Rule.

7. Md.Code (2002), § 9–306 of the Criminal Law Article states:
   I.   Prohibited. A person may not, by threat, force, or corrupt means, obstruct, impede, or try to obstruct or impede the administration of justice in a court of the State.
   II.  Penalty. A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both.

8. Md.Code (2002) § 9–501 of the Criminal Law Article states:
   1) Prohibited. A person may not make, or cause to be made, a statement, report, or complaint that the person knows to be false as a whole or in material part, to a law enforcement officer of the State, of a county, municipal corporation, or other political subdivision of the State, or of the Maryland–National Capital Park and Planning Police

in-chief, regardless of what the plea agreement provides. This unnecessarily undermines the integrity of the legal process, by gratuitously suppressing important evidence. And it does so without serving any countervailing public policy.

On the other hand, if the defendant rescinds the agreement, without having ever violated it, his statements are admissible, if his plea agreement so states. *Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986). Thus, the statements of say a perjurious defendant are excluded, simply because the State, with substantial justification, as here, rescinded the plea agreement, while the statements of a defendant, who withdraws his plea, because of a change of heart, receives no such protection. The result is an invitation to those who wish to withdraw their plea to first breach their plea agreement so completely and unconscionably that the State feels compelled to rescind it.

If there is one factor to be considered in determining whether to permit the introduction of an inculpatory statement, as authorized by the plea agreement, it is who breached the agreement. That approach is consistent with basic principles of contract law, which places the blame for an agreement's dissolution on the breaching party and not on the party who rescinds the contract because of that breach. *United States v. Harvey,* 791 F.2d 294, 300 (4th Cir.1986). And, that is, after all what a plea agreement is—a contract. A contract, which the Supreme Court observed, is between two parties, "which arguably possess relatively equal bargaining power." *Parker v. North Carolina,* 397 U.S. 790, 809, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1974).

That a plea agreement typically involves the waiver of certain constitutional rights should not alter, at least in this instance, our approach. Constitutional rights, like other rights, can be waived. *See Godinez v. Moran,* 509 U.S. 389,

---

with intent to deceive and to cause an investigation or other action to be taken as a result of the statement, report, or complaint.

2) Penalty. A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 6 months or a fine not exceeding $500 or both.

397, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993)(a criminal defendant waived three rights when he plead guilty: the privilege against self-incrimination, the right to a jury trial, and the right to confront his accusers); *Estelle v. Williams,* 425 U.S. 501, 512, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)(a claim of error was waived where a criminal defendant was tried in jail clothes); *Davis v. United States,* 411 U.S. 233, 244, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973)(objection to the racial composition of a grand jury, which was unconstitutionally discriminatory, was waived in federal proceedings). And just as in any other contract, the court should be permitted to enforce a provision of the contract, which the parties have agreed can be invoked in the event of a breach. In other words, if the agreement is found by a court to have been materially breached by the defendant, then the court should be able to allow the introduction of any inculpatory statement, whose introduction has been authorized by that plea agreement in the event of a breach.

And finally, although I do concur in the result reached by the majority, I also disagree with the policy analysis it offers to justify its application of the "rescission rule." The majority contends that the "rescission" rule is necessary because it encourages plea bargaining. If the State can rescind an agreement and then introduce the defendant's inculpatory statement, pursuant to its terms, it will have a "chilling effect on a defendant's willingness to enter plea bargains," the majority insists. This is an interesting twist of logic. It seems to me that the only people who will be dissuaded by the State's right to introduce their statements in the event that they materially breach their plea agreements are those who do not intend to abide by their plea agreements in the first place. And if such people are dissuaded from entering into a plea agreement, suffice it to say, that is a good thing.

Moreover, I question whether it is appropriate for this Court to, in effect, strike a provision of a plea agreement on the grounds that it may discourage future defendants from entering plea agreements. The State's Attorney Office has far more experience in this area and knowledge as to what encourages or discourages defendants from entering into such

agreements. If any provision of a standard plea agreement proves counter-productive, that office will know it first and presumably make the necessary changes.

Dissenting Opinion by BARBERA, J.

I respectfully dissent.

In my view, the suppression court correctly rejected appellant's argument that statements he made as part of a negotiated plea agreement—which the State repudiated only after appellant breached the agreement—were the product of an inducement and, so, inadmissible at his trial. Contrary to the view of the majority, I do not believe that the Court of Appeals' decision in *Allgood v. State,* 309 Md. 58, 522 A.2d 917 (1987), dictates a contrary result.

As the majority points out, appellant bargained with the Assistant State's Attorney that, in return for the State's *nolle pros* of all charges against him arising out of the burglary investigation, he would, *inter alia,* "fully and truthfully disclose to the State any and all knowledge and information he may have concerning the investigation." Appellant further agreed that, if at any time he knowingly withheld evidence from the State or was not "completely truthful with the State in his testimony before the grand jurors or at trials," then the State would be free to "use against him in all prosecutions the information and documents that he has disclosed to the State during the course of his cooperation." Appellant and the Assistant State's Attorney signed the memorandum of agreement reflecting this quid pro quo.

Appellant reneged on his part of the bargain by giving the police incomplete information about his knowledge of the burglary, causing the State to rescind the agreement. The State duly offered the statements against appellant in its case in chief, and it is of course the correctness of the court's allowing this evidence that is before us now.[1]

---

1. Appellant also sought suppression of his statements on the ground that they were obtained in violation of *Miranda v. Arizona,* 384 U.S.

I agree with the majority that the outcome of this case turns on two decisions of the Court of Appeals: *Allgood,* and an earlier decision upon which *Allgood* is largely premised, *Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986). The Court of Appeals made quite clear in *Wright* that the inducement cases, *Nicholson v. State,* 38 Md. 140 (1873); *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979); *Stokes v. State,* 289 Md. 155, 423 A.2d 552 (1980); and their progeny, had no application to statements properly "induced" as part of a plea agreement:

> Under the principle applied in the above cases, if the police or the Assistant State's Attorney had simply told Coley that a confession and guilty plea to second degree murder would result in his not being prosecuted for first degree murder, and if Coley had confessed because of that inducement, his confession would be deemed involuntary and inadmissible at his trial.

307 Md. at 583, 515 A.2d 1157. The Court emphasized that Coley's case involved "something quite different" and "significantly distinguishable" from that involved in *Nicholson, Hillard,* and *Stokes. Id.* The Court said: "Here, the inducement by the State took the form of promises under a negotiated plea bargain agreement, made in exchange for Coley's promises under that agreement." *Id.* Moreover, "[t]he mutual promises were specifically authorized by Rule 4–243." *Id.* at 583, 585, 515 A.2d 1157. And, "the agreement specified that if Coley reneged, his inculpatory statements could be used against him at trial." *Id.* at 585, 515 A.2d 1157. Finally, the Court noted, "[t]he State neither rescinded nor breached the agreement." *Id.*

---

436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant raised that argument on appeal as a separate basis for reversing the suppression court's ruling. Having decided that appellant's statements should have been suppressed as the product of an inducement, the majority had no need to reach the question of the alleged *Miranda* violation. I have reviewed the record developed at the suppression hearing, the suppression court's extensive fact findings and ruling on the issue, and the parties' respective arguments on appeal. There appears to be no merit to appellant's *Miranda* contention.

The Court added that it would be "anomalous" "to hold that the State's actions were 'improper' when they are expressly authorized by law (*i.e.*, Rule 4–243) and when the State neither rescinds nor breaches the plea bargain agreement." *Id.* The Court went on to say: "Obviously, the rule does not contemplate that the defendant's promises be deemed per se involuntary, under *Hillard* and other cases, on the ground that they were induced by the State's promises." *Id.*

The Court rejected Coley's argument that *Hillard* should be extended, on "policy" grounds, to the present situation in order to encourage plea bargaining. *Id.* at 586, 515 A.2d 1157. The Court concluded:

> In the situation now before us, we do not believe that it would foster the policy favoring plea bargain agreements to hold Coley's statements inadmissible. On the contrary, it would likely have the opposite result, encouraging defendants to rescind consummated plea bargain agreements without justification. Consequently, we decline to extend *Hillard* to the case now before us.

*Id.* at 587, 515 A.2d 1157.

It was to the rationale and holding of *Wright* that the Court looked in deciding *Allgood* the following year. The proposed plea agreement (it was never executed) called for Allgood, a Navy seaman, to testify before the grand jury and at trial and to disclose to the State the truth about the murder with which he was charged. In exchange, the State promised to accept a guilty plea to manslaughter and a suspended sentence and probation. Allgood gave a statement to the prosecutor, but even before Allgood was taken before the grand jury to testify, the prosecutor had doubts that Allgood was being truthful. Eventually, and after Allgood's grand jury testimony, the prosecutor proposed that Allgood would take a polygraph test to determine whether he was being truthful. Allgood agreed to take the polygraph test in return for the State's securing his transfer from the Baltimore City Jail, where he was being held on "no bail status," to the custody of the Navy. 309 Md. at 60–64, 522 A.2d 917.

Allgood took the polygraph test and failed it. This led the State to repudiate the plea agreement and proceed to trial. The court denied Allgood's motion to enforce the plea agreement and admitted his grand jury testimony over his objection at trial. *Id.* at 65, 522 A.2d 917.

The Court of Appeals held that, because Allgood failed the polygraph test and the parties had agreed to abide by its results, the State was entitled to repudiate the agreement. Therefore, the trial court properly denied Allgood's motion to enforce the agreement. *Id.* at 71–72, 522 A.2d 917.

Of particular relevance to the present case, the Court further held that the trial court erred in permitting the State to use Allgood's grand jury testimony against him in its case in chief. The Court reasoned that because the State had repudiated the plea agreement, Allgood's grand jury testimony was inadmissible per se in the State's case in chief.

Important to the Court in *Allgood* was the repeated references in *Wright* to the fact that the State in that case had not breached, rescinded, or repudiated its plea agreement with Coley. *See id.* at 77–78, 522 A.2d 917 (referencing the Court's statements of same in *Wright*). The Court distinguished *Wright,* saying:

> The decisive difference between Coley's situation and that of Allgood is that the defendant reneged on the agreement in the former but the State terminated the agreement in the latter. In Coley's case, "the State neither rescinded nor breached the agreement." In Allgood's case the State flatly rescinded the agreement in a letter to defense counsel, and thereafter refused to submit it to the court. It proceeded to try Allgood on the murder and robbery charges despite his desire to plead pursuant to the agreement.

*Id.* at 77, 522 A.2d 917 (citations omitted).

Of particular relevance to the present case, the Court went on to point out another distinction between Coley's situation and that of Allgood:

> Furthermore, the Coley agreement "specified that if Coley reneged, his inculpatory statements could be used against

him at trial." The agreement with Allgood contained no such provision. Allgood answered "Yes" when he appeared before the Grand Jury to the question if he understood that "anything you say here can be used against you in a court of law." But this is far from an agreement that his statements could be used against him at trial. In fact, the accuracy of the question so broadly phrased is at least questionable. *Id.* (citations omitted).

The Court, summarizing the teachings of *Wright,* laid out the rules governing the admissibility of statements obtained pursuant to plea agreements:

1) When statements are obtained from a defendant upon promises made him by the State by way of a plea bargain agreement, the statements, in the light of Rule 4–243, are not inadmissible *per se,* under that inducement doctrine, in the State's case in chief at trial on the merits.

2) When the State rescinds, repudiates, or breaches the plea bargain agreement, for whatever reason, after the statements are so obtained, the statements as a matter of law are inadmissible *per se* in the State's case in chief at trial on the merits.

*Id.* at 78, 522 A.2d 917. The Court went on to say:

*Wright* fully appreciated that promises to the defendant of the nature usually encompassed in plea bargain agreements, certainly suffice to induce a statement obtained, so that, ordinarily, the inducement most assuredly would be improper. The intervention of a plea bargain agreement, however, expressly authorized by law, serves to make the inducement proper. Thus, the plea agreement, in itself, does not render the statement inadmissible. On the other hand, *Wright* recognized the chilling effect on plea bargaining were the State permitted to enter into a plea agreement, obtain a statement thereunder, abort the agreement, and then use the statement in its case in chief at trial on the merits. The reason for the State's repudiation of the agreement is immaterial with respect to the admissibility of the statement. Whether its reason be sound or unsound, tech-

nical or substantial, in good faith or simply because the prosecutor had misgivings or a change of heart, or was utterly arbitrary, is of no matter. The justification *vel non* of the rescission, repudiation, or breach of the agreement by the State goes to whether the defendant is entitled to have the agreement enforced; it does not affect the admissibility of the statement obtained under it. This is in accord with the rationale of *Wright*.

*Id.* at 78–79, 522 A.2d 917.

Certainly, at first blush, this language would seem to preclude the State's use of appellant's statements in this case, since it was the State who repudiated the agreement. Such a mechanistic application of *Allgood* to the facts of this case, however, overlooks what are fundamental distinctions between that case and this one.[2] I do not read *Allgood* as governing the situation presented here, where the defendant expressly agrees as a term of the agreement that, upon his breach, the State is free to use his statements against him at trial. On this score, the Supreme Court's decision in *United States v. Mezzanatto*, 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), is quite instructive.

*Mezzanatto* was decided one year after the Court of Appeals' adoption of the Maryland Rules of Evidence, which includes Rule 5–410.[3] That rule addresses the use of statements made by the defendant in plea negotiations, and is

---

2. I agree wholeheartedly with Judge Krauser's observation in the concurring opinion that application of the rule of *Allgood* "unnecessarily undermines the integrity of the legal process, by gratuitously suppressing important evidence. And it does so without serving any countervailing public policy." (Krauser, J., concurring, slip op. at 9).

3. Rule 5–410 provides, in pertinent part:

(a) **Generally.** Except as otherwise provided in this Rule, evidence of the following is not admissible against the defendant who made the plea or was a participant in the plea discussions:

(4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or nolo contendere or which result in a plea of guilty or nolo contendere which was not accepted or was later withdrawn or vacated.

modeled after the counterpart federal rule, Federal Rule of Evidence 410. *Elmer v. State*, 353 Md. 1, 10, 724 A.2d 625 (1999). *Mezzanatto* involves Federal Rule of Evidence 410, and Federal Rule of Criminal Procedure 11(e)(6), which control a criminal defendant's waiver of these rules' proscription against the use at trial of statements made by a defendant in plea negotiations.

In that case, Mezzanatto was arrested and charged with drug offenses. He and his attorney later met with the prosecutor to discuss the possibility of his cooperating with the Government. 513 U.S. at 198, 115 S.Ct. 797. At the outset of the meeting, the prosecutor told Mezzanatto that, "[a]s a condition to proceeding with the discussion, the prosecutor indicated that respondent would have to agree that any statements he made during the meeting could be used to impeach any contradictory testimony he might give at trial if the case proceeded that far." *Id.* Mezzanatto conferred with counsel and agreed to the prosecutor's terms. He then gave an inculpatory statement. Other aspects of his statement to the prosecutor, however, suggested that he had minimized his role in the drug transaction. The Government terminated the meeting on the basis of Mezzanatto's failure to give completely truthful information. *Id.* at 198–99, 115 S.Ct. 797.

At his trial, and over the objection of defense counsel, the Government used Mezzanatto's inculpatory statement on cross-examination of him. When he denied making the statement, the Government called one of the agents who had attended the meeting to recount the prior statement. *Id.* at 199, 115 S.Ct. 797.

Mezzanatto was convicted and, on appeal, a divided panel of the United States Court of Appeals for the Ninth Circuit reversed. The court held that the admission of the statement violated Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(e)(6), reasoning that the defendant could not waive the protections of those rules. *United States v. Mezzanatto*, 998 F.2d 1452, 1454–56 (9th Cir.1993).

The Supreme Court reversed. The Court held that a federal criminal defendant's agreement to waive the exclusionary provisions of the plea-statement rules is valid and enforceable, absent some affirmative indication that the defendant's entry into the agreement was unknowing or involuntary.

The Court reasoned that the plea-statement rules in effect create a privilege on behalf of the defendant which, like other evidentiary privileges, may be waived or varied at the defendant's request, 513 U.S. at 203–04, 115 S.Ct. 797, and that enforcement of a waiver agreement such as the one at issue "*enhances* the truth-seeking function of trials and will result in more accurate verdicts," *id.* at 204, 115 S.Ct. 797. The Court noted that "[r]espondent has identified nothing in the structure or history of the plea-statement Rules that suggests that they were aimed at preventing private bargaining; in fact, [the Court's discussion of the Rules] suggests that the Rules adopt a contrary view." *Id.* at 206 n. 4, 115 S.Ct. 797.

The Court also rejected the notion that permitting waiver of the Rules' prohibitions would interfere with the plea-statement rules' goal of encouraging plea bargaining:

> [T]here is no basis for concluding that waiver will interfere with the Rules' goal of encouraging plea bargaining. The court below focused entirely on the *defendant's* incentives and completely ignored the other essential party to the transaction: the prosecutor. Thus, although the availability of waiver may discourage some defendants from negotiating, it is also true that prosecutors may be unwilling to proceed without it.

*Id.* at 207, 115 S.Ct. 797.

The Court added that "[i]f prosecutors were precluded from securing such agreements, they might well decline to enter into cooperation discussions in the first place and might never take this potential first step toward a plea bargain." *Id.* at 207–08, 115 S.Ct. 797. "A sounder way to encourage settlement is to permit the interested parties to enter into knowing and voluntary negotiations without any arbitrary limits on their bargaining chips." *Id.* at 208, 115 S.Ct. 797.

Although not directly on point with the present case, *Mezzanatto* does reflect the Supreme Court's recognition of the policy that favors holding a defendant "to the bargain that had been negotiated before he made any statement." JOSEPH F. MURPHY, JR. MARYLAND EVIDENCE HANDBOOK § 805(B), at 336 (3d ed.1999).

This view of course echos that held in this State. *Wright,* 307 Md. at 591–95, 515 A.2d 1157. *Mezzanatto* is also consistent with the view held in Maryland that plea bargains are to be encouraged, *State v. Brockman,* 277 Md. 687, 694, 357 A.2d 376 (1976), and that constitutional rights can be knowingly and intelligently waived, *see, e.g., State v. Priet,* 289 Md. 267, 424 A.2d 349 (1981) (discussing waiver of constitutional rights in the context of a guilty plea).

To be sure, the present case is not precisely like *Wright,* because here the State repudiated the plea agreement, albeit following the defendant's breach. But it is also not precisely like *Allgood,* because the present case involves appellant's essentially "waiving" the protections addressed by the *Allgood* rules.

In any event, neither *Wright* nor *Allgood* should preclude what happened here. Appellant struck a bargain fully cognizant of the consequences of his failure to honor his part of the bargain. He breached his agreement with the State, and, as bargained, the State used his statement against him at his subsequent trial. The determination of whether appellant's statement should be used against him should focus on these facts, not on the fact that the State, as it was entitled to do, repudiated the agreement as the direct result of appellant's breach. In my view, *Allgood* ought not be read so broadly as to foreclose the State from holding appellant to the bargain he had negotiated, and using his statements against him at his criminal trial.